Eli BALLAN, Plaintiff,

v.

WILFRED AMERICAN EDUCATIONAL CORPORATION, Albert H. Brodkin, Philip E. Jakeway, Jr., Francis C. Rooney, Jr., Dominick A. Albano, Anthony B. Colletti, Lloyd Frank, Philip E. Jakeway III, Ann D. Lovatt, and James W. Moore, Defendants.

No. 88 C 3921.

United States District Court, E.D. New York.

Aug. 30, 1989.

Rabin & Sirota (Zachary Alan Starr, of counsel), New York City, for plaintiff.

Parker Chapin Flattau & Klimpl (Stephen G. Rinehart, of counsel), New York City, for defendant Wilfred American Educational Corp.

Herbert L. Scharf, Woodmere, N.Y., for defendants Brodkin and Frank.

Scheffler Karlinsky & Stein (Robert P. Stein, Ronald D. Lefton, and Lori A. Friedman, of counsel, New York City, for defendants Jakeway, Jr., Jakeway III, Colletti, and Lovatt.

Debevoise & Plimpton (Asa Rountree, John G. Koeltl, and Edwin G. Schallert, of counsel), New York City, for defendants Rooney and Albano.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff brought this action under §§ 10(b) and 20(a) of the Securities Exchange Act (the Act), 15 U.S.C. §§ 78j(b), 78t(a) (1982), Rule 10b–5 promulgated under § 10(b), 17 C.F.R. § 240.10b–5 (1988), and common law. The complaint alleges that defendants did not disclose their failure to comply with government regulations and the potential consequences of government investigations into that failure. Defendants move to dismiss on the grounds that the complaint does not state a claim upon which relief can be granted or plead fraud with particularity, and that there is no subject matter jurisdiction over the pendent state law claim.

### I.

For the purposes of the motion, the court assumes the truth of the facts alleged.

Defendant Wilfred American Educational Corporation (Wilfred) owns and operates many "career" schools throughout the United States. They teach vocational subjects ranging from hairdressing to automotive training. Wilfred is a publicly traded company with over nine million shares of common stock (the Stock) issued and outstanding.

The other defendants (the individual defendants) are directors of Wilfred. Defendant Philip E. Jakeway, Jr. (Jakeway), is Chairman of the Board and President, and his son, defendant Philip E. Jakeway III, is Executive Vice President. Defendants Colletti and Lovatt were at one time Wilfred officers but had retired by 1987.

Plaintiff purchased fifty shares of the Stock on May 12, 1987. He seeks to represent a class of all persons who bought Wilfred securities on the open market (the Class) from October 10, 1984 through December 12, 1988 (the Class Period), excluding defendants and their affiliates, successors, and families.

The claims concern Wilfred's participation in financial aid programs administered by the United States Department of Education (the Education Department). About 95% of Wilfred's students receive some form of government-sponsored financial aid. Between 85% and 90% of Wilfred's revenues come from such aid, much of it from loan programs administered by the Education Department.

Participation in government loan programs subjects Wilfred to extensive regulation and to audit and compliance reviews by administering agencies. An institution failing to comply with the regulations risks suspension, limitation, or termination of its participation in the programs as well as fines, penalties, and damages.

Beginning before October 1984, defendants "flagrantly" violated those regulations by encouraging students to submit false aid applications. They also "fostered an environment" conducive to regulatory violations by, among other things, failing to supervise Wilfred employees so as to ensure that they complied with the regulations.

In October 1984 Wilfred completed an initial public offering of the Stock. The registration statement and prospectus through which the shares were sold did not disclose that Wilfred had not complied with the student aid regulations, that Wilfred's hiring practices and internal controls were inadequate to insure full compliance, that Wilfred's "corporate environment ... was such as to actually encourage noncompliance," and that it was reasonably likely that noncompliance would result in Wilfred's suspension from participation in government aid programs.

Around January 1985 both the Education Department and the United States Department of Justice (the Justice Department) began inquiry into the administration of financial aid programs at some Wilfred schools. Defendants did not reveal those investigations in Wilfred's 1984 Annual Report to shareholders or in its 1984 Annual Report on Form 10–K, filed with the Securities and Exchange Commission (SEC) on April 1, 1985.

On April 2, 1985 an article in the *St. Petersburg Times* exposed the existence of the investigations. On April 5, 1989 Wilfred filed with the SEC a Form 8 acknowledging the investigations. Defendants did not, however, disclose the investigations in any document likely to be received by shareholders or the investing public.

Instead, defendants launched a scheme to conceal the investigations and to mislead shareholders and the investing public into believing that Wilfred's financial condition would not be jeopardized by the investigations or by Wilfred's financial aid procedures. To that end, on about February 27, 1985 Wilfred announced record revenues and net income for the fiscal year ended December 31, 1984. The announcement did not state that the revenues and net income were the result of Wilfred's failure to comply with government aid regulations and that investigations into that failure were pending.

Similarly misleading were Wilfred's announcements issued about May 8, 1985 and August 8, 1985 relating to first and second quarter earnings. Wilfred's quarterly reports on Form 10–Q for quarters ended March 30, 1985, June 30, 1985, September 30, 1985, and March 31, 1986 and its Annual Report to shareholders for the fiscal year ended December 31, 1985 also failed to reveal the pendency of the investigations.

In its quarterly report on Form 10-Q for the quarter ended June 30, 1986, filed with the SEC on August 12, 1986, Wilfred disclosed the existence of the investigations and added: "No actions have been instituted against the Company as a result of these inquiries, the earliest of which was initiated approximately 1½ years ago." Wilfred omitted to state, although it knew, that (1) the investigations related to serious charges that Wilfred admissions representatives had counseled students to submit false applications for financial aid and (2) the investigations were nearly complete and actions against Wilfred and some of its employees were imminent.

On October 21, 1986 a federal grand jury in the District of Massachusetts indicted seven former admissions representatives at two Wilfred schools on charges of aiding, abetting, and counseling students to submit false applications for federal grants.

In its quarterly report to shareholders on Form 10-Q for the quarter ended September 30, 1986, filed with the SEC on November 14, 1986, Wilfred disclosed those indictments, but did not state that action by the Justice Department against Wilfred itself and a subsidiary was "imminent" and that the Education Department had served administrative subpoenas on both Wilfred and nine Wilfred schools.

In its Annual Report to shareholders for the fiscal year ended December 31, 1986, filed with the SEC on May 4, 1987, Wilfred further sought to mislead the investing public about its compliance with the regulations. The Chairman of the Board's letter to shareholders in that report, dated March 13, 1987, stated:

> The Company's administration of student financial aid is being investigated. As a result, our auditors have made reference to this in their report. The Company's policy, of course, has always been to comply with all applicable laws and regulations. To further ensure that federal and state funding is used in a responsible way, we added additional, elaborate compliance and control steps which we believe are the best procedures in the industry.

The letter went on to discuss Wilfred's financial outlook "in a highly positive manner."

These statements in the letter to shareholders falsely suggested that any failure to comply with government regulations was not widespread, prior "compliance and control steps" had been adequate, and Wilfred's management had not been involved in any wrongdoing. The statements did not explain the nature, seriousness, and impact of the government investigations.

"Tucked away" in a note to Wilfred's consolidated financial statements at the back of the 1986 Annual Report was a more detailed description of the investigations. The report added:

> Were an action to be instituted, and were an adverse decision to be rendered against the Company, fines, penalties and damages could result and the Company could be subject to suspension, limitation or termination from participation in government financial aid programs.

> The Company believes that its policies are in compliance with applicable regulations and, if any employees violated any government regulations, those employees were acting against Company policy.

Wilfred's quarterly reports on Form 10-Q for the quarters ended March 31, 1987, June 30, 1987, and September 30, 1987 contained the same information as the Annual Report. They made no mention of the Justice Department's expansion of its investigation, of the issuance of a grand jury subpoena in the District of Columbia, of the indictment on charges of perjury of an admissions representative at one of Wilfred's schools in Massachusetts, or that many former and current Wilfred employees were targets of the investigations.

Throughout the Class Period Wilfred failed to reveal how it administered student financial aid during the period under investigation. Nor did it disclose the likelihood that Wilfred and some of its employees would be indicted, that Wilfred would be suspended from participating in government-sponsored student financial aid programs, and that Wilfred and Jakeway would be charged with racketeering under

the Racketeer Influenced and Corrupt Organizations Act (RICO), resulting in possible forfeiture of Wilfred's assets.

In October 1988 a grand jury in the Middle District of Florida indicted Wilfred, Jakeway, and eighteen present and former Wilfred employees for violations of various laws in connection with Wilfred's administration of student financial aid. The indictment charged Wilfred and Jakeway with conspiring to defraud the Education Department, with 28 counts of making false statements before the Education Department, with 27 counts of stealing, embezzling, or misapplying funds provided or insured by the Education Department, with eight counts of wire fraud, and with one count of racketeering under RICO.

At the same time several financial aid programs placed Wilfred's schools on a "reimbursement" system of payment. Under that system Wilfred could receive financial aid payments only after the relevant agency had approved Wilfred's documentation. Wilfred had previously been on a more favorable "in advance" payment plan.

Wilfred's quarterly report on Form 10–Q for the quarter ended September 30, 1988, filed with the SEC on November 14, 1988, disclosed the October 1988 indictments in Florida but did not explain that they included a RICO count subjecting Wilfred to possible forfeiture of its assets.

On December 12, 1988 the news media reported that beginning December 23, 1988 the Education Department would suspend Wilfred's participation in student financial aid programs for 60 days and that it would suspend Wilfred and Jakeway from participating in federal aid programs and from conducting business with Wilfred schools in connection with new student loans or grants until the earlier of December 1989 or the outcome of the indictment.

The Stock, first offered to the public in October 1984 at $10¾ per share, traded throughout 1985 and the first three quarters of 1986 at prices ranging from $9⅜ to $15⅛ per share.

By the fourth quarter of 1986 the Stock had declined to $8¾ per share. Throughout 1987 the Stock price continued to fall.

By the first half of 1988 the Stock was trading in the range of $4½ to $5½ per share. Just before the announcement of the October 1988 indictments it traded at $5⅝ per share.

Following that announcement the Stock price continued its descent. After the December 12, 1988 revelation that Wilfred had been suspended from participating in federal student loan programs, the Stock plummeted to $3 per share.

The purposes of defendants' fraudulent scheme were to induce plaintiff and other members of the Class to purchase the Stock at an artificially inflated price, to protect the Wilfred officers' executive and board positions, and to enhance the value of the Stock holdings of the Wilfred officers. As officers, directors, and controlling shareholders of Wilfred, the individual defendants knew both of the widespread noncompliance with government aid requirements and of Wilfred's failure to disclose it.

"By reason of their stock ownership, management positions and/or memberships on Wilfred's Board of Directors," the individual defendants are "control persons" of Wilfred under § 20(a) of the Act and liable for its wrongs. They also aided and abetted the securities fraud described in the complaint.

Plaintiff relied on the defendants' misrepresentations "and/or" the integrity of the market in purchasing his shares of the Stock. If defendants had not withheld material facts from the market, the price of the Stock would have reflected its true value, and plaintiff would not have purchased it on May 12, 1987 for an inflated price.

II.

Defendants move to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.

A. *Documents Considered on this Motion*

■ The parties dispute the posture in which the motions reach the court. Defen-

dants attach to their motion papers certain SEC filings claimed to be incorporated by reference in the complaint. Plaintiff contends that the court may not consider those exhibits unless it converts the motion to one for summary judgment. In that event plaintiff asks the court to consider still other documents, including the Massachusetts and Florida indictments.

On a motion to dismiss for failure to state a claim the court may properly consider those public documents, including SEC filings and indictments, to which plaintiff refers in the complaint. *See Field v. Trump,* 850 F.2d 938, 949 (2d Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989). The court does not consider on this motion the other documents submitted by the parties.

The court may dismiss the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). However great the odds against a plaintiff's ultimate success, if the complaint states a claim, he is entitled to his day in court. *Index Fund, Inc. v. Hagopian,* 609 F.Supp. 499, 510 (S.D.N.Y.1985).

### B. *The Section 10(b) Claims*

Section 10(b) of the Act provides in pertinent part that it is unlawful for any person to "use or employ" a "manipulative or deceptive device or contrivance" in connection with the purchase or sale of any security. 15 U.S.C. § 78j(b).

Pursuant to this section, the SEC promulgated Rule 10b–5, which provides, so far as relevant, that it is unlawful "for any person, directly or indirectly," "in connection with the purchase or sale of any security,"

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b–5 (1988).

To state a claim under § 10(b) and Rule 10b–5, plaintiff must allege: (1) damages (2) caused by his reliance (3) on defendants' misrepresentations or omissions of material facts, or on a scheme by defendants to defraud, (4) made with an intent to deceive, manipulate, or defraud, (5) in connection with the purchase or sale of securities, and (6) furthered by defendants' use of the mails or any facility of a national securities exchange. *E.g., Lloyd v. Industrial Bio-Test Laboratories, Inc.,* 454 F.Supp. 807, 810 (S.D.N.Y.1978).

As noted above, the complaint alleges that plaintiff purchased shares of the Stock on May 12, 1987. According to the complaint, as of that date defendants had disclosed the following matters:

| What | Where | When |
|---|---|---|
| the existence of the investigations by the Education and Justice Departments | Form 8 | April 5, 1985 |
| when the investigations began; grand juries convened in Massachusetts and Florida | Form 10–Q | Aug. 12, 1986 |
| the Oct. 21, 1986 indictments of seven employees in Massachusetts | Form 10–Q | Nov. 14, 1986 |
| service of administrative subpoenas on Wilfred and nine subsidiaries; guilty pleas in Massachusetts; receipt of "target letters"; possibility of fines, penalties, dam- | | |

| What | Where | When |
| --- | --- | --- |
| ages, and suspension, limitation, or termination from government financial aid programs | Annual Report & Form 10–K | May 4, 1987 |

Plaintiff claims that these disclosures were insufficient to alert him to the gravity of the harm posed to Wilfred's financial condition by the investigations. Plaintiff says defendants should have gone further and revealed that (1) Wilfred practices violated government regulations required of participants in the student aid programs, and (2) it was likely that the investigations would result in Wilfred's suspension from those programs.

### 1. Were There Omissions of "Fact"?

■ Rule 10b–5 speaks of omissions to state a "material fact" necessary to make the statements made not "misleading." Thus it is only "facts" that an issuer of securities and its officers must disclose. Defendants contend that the critical omissions of which plaintiff complains are not omissions of fact but speculations about the future or legal conclusions amounting to confessions to uncharged crimes.

Defendants do not dispute that in 1985 and 1986 they had to reveal, as they did, the investigations of Wilfred or that they were obligated to disclose, as they did, the October 21, 1986 indictments. But they dispute plaintiff's contention that while Wilfred was under investigation and before the 1988 indictments issued, § 10(b) required defendants to tell shareholders the likelihood that Wilfred would be indicted, the consequent likelihood of its suspension from the aid programs, the likelihood that it would be charged under RICO and its assets forfeited, and the imminence of further indictments.

Wilfred was not obligated to disclose information of which it had no knowledge or about which it could only speculate. *Cf. Fisher v. Plessey Co. Ltd.,* 559 F.Supp. 442, 450–51 (S.D.N.Y.1983). Indeed, it would be misleading for it to do so.

Grand juries operate in secret. Government investigations do not typically advise their targets of the likelihood of indictment. The "imminent" indictments of Wilfred and Jakeway did not materialize until a year and a half after plaintiff's purchase. The outcome of legal proceedings is inevitably uncertain. *Cf. World Series of Casino Gambling, Inc. v. King,* [1986–1987 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 92,981, at 94,814 (S.D.N.Y. 1986); *Margolis v. Masters, Inc.,* [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,855, at 90,287, 90,289 (E.D.N.Y.1981).

Therefore defendants were not bound to predict as the "imminent" or "likely" outcome of the investigations that indictments of Wilfred and its chief officer would follow, with financial disaster in their train.

■ Defendants also contend that they need not have made confessions of guilt to uncharged crimes or disclosed facts that tended to incriminate them. They say that to require them to do so would pose a threat to their Fifth Amendment right against self-incrimination.

■ A corporation has no privilege against self-incrimination. *See, e.g., United States v. Kordel,* 397 U.S. 1, 7, 90 S.Ct. 763, 766, 25 L.Ed.2d 1 (1970). If § 10(b) required disclosure of facts potentially incriminating the individual defendants, and they wished to invoke their privilege against self-incrimination, they could cause the corporation to " 'appoint an agent who could, without fear of self-incrimination, furnish such [required] information as was available to the corporation.' " *Id.* at 8, 90 S.Ct. at 767 (quoting *United States v. 3963 Bottles ... of ... "Enerjol Double Strength",* 265 F.2d 332, 336 (7th Cir.), cert. denied, 360 U.S. 931, 79 S.Ct. 1448, 3 L.Ed.2d 1544 (1959)).

The individual defendants never asserted their Fifth Amendment right as a ground for not disclosing the information, let alone demonstrated that there was no authorized person who could make the required disclosures. They thus may not now assert that

to require them to make the disclosures would violate their Fifth Amendment rights. *See id.* 397 U.S. at 9–10, 90 S.Ct. at 768.

■ Cases in this circuit have held, however, that the SEC's proxy disclosure rules do not require a company's management to confess guilt to uncharged crimes, *United States v. Matthews,* 787 F.2d 38, 49 (2d Cir.1986), or " 'to accuse itself of antisocial or illegal policies.' " *GAF Corp. v. Heyman,* 724 F.2d 727, 740 (2d Cir.1983) (quoting *Amalgamated Clothing & Textile Workers Union v. J.P. Stevens & Co.,* 475 F.Supp. 328, 331 (S.D.N.Y.1979), *vacated as moot,* 638 F.2d 7 (2d Cir.1980)); *see Condec Corp. v. Farley,* 573 F.Supp. 1382, 1386–87 & n. 4 (S.D.N.Y.1983).

As the opinion in the *Amalgamated Clothing* case put it, such a requirement "would make a silly, unworkable rule. It would not promote increased disclosure, but would serve only to support vexatious litigation and abusive discovery." *Supra,* 475 F.Supp. at 332. There is no reason why a different rule should apply under § 10(b).

Those cases address whether corporate management should be compelled to direct conclusory accusations at itself or to characterize its behavior in a pejorative manner. It would be "silly" and "unworkable" to require Wilfred to state, for example, "The Company promotes a corporate culture in which violations of government regulations are bound to occur," or "The Company is in flagrant violation of numerous governmental regulations."

■ It does not follow, however, that defendants need not disclose facts showing that Wilfred's management or employees committed specific acts or permitted specific practices that an informed investor would consider as potentially endangering its future financial performance. Such acts or practices are not speculations or confessions but "facts" relevant to a person's decision to invest in Wilfred.

The fact that a defendant's act may be a crime does not justify its concealment. As the First Circuit has expressed it, "The

securities laws do not operate under the assumption that material information need not be disclosed if management has reason to suppress it. . . . Excepting from the disclosure rules information management has reason to hide would eviscerate the protection for investors embodied in the securities laws." *Roeder v. Alpha Indus.,* 814 F.2d 22, 25 (1st Cir.1987); *see also Greenfield v. Professional Care, Inc.,* 677 F.Supp. 110, 113 (E.D.N.Y.1987).

### 2. Were the Omitted Facts "Material"?

Rule 10b–5 refers to the omission of a "material" fact necessary to make the statements made not "misleading." Defendants thus had a duty to disclose "facts" if their omission made what they did state materially misleading. *See Basic, Inc. v. Levinson,* 485 U.S. 224, —— n. 17, —— n. 18, 108 S.Ct. 978, 987 n. 17, 988 n. 18, 99 L.Ed.2d 194 (1988) ("the ever-present duty not to mislead").

■ An omitted "fact" is "material" if there is "a substantial likelihood" that a reasonable investor would have viewed the facts withheld, if revealed, as sufficient to alter significantly the "total mix" of information made available. *Id.,* 485 U.S. at ——, 108 S.Ct. at 983 (quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). In other words, if those omitted facts would have made a difference to a reasonable investor, they are material.

If the omissions are "so obviously important to an investor that reasonable minds cannot differ on the question of materiality," the court may find them material as a matter of law. *TSC Indus., supra,* 426 U.S. at 450, 96 S.Ct. at 2132 (quoting *Johns Hopkins Univ. v. Hutton,* 422 F.2d 1124, 1129 (4th Cir.1970)). By the same token, the court may find alleged omissions immaterial if the facts omitted plainly would add to the information available nothing that reasonable minds would regard as significant. If there is room for difference the issue of materiality is for the jury.

■ The complaint shows that by May 12, 1987 defendants had disclosed the in-

vestigations, the Massachusetts indictments, and some possible consequences. In the light of what was revealed defendants contend that no reasonable investor could consider the omissions of "fact" to which plaintiff points to be important.

It is true that defendants had disclosed much that, to an alert prospective purchaser, was hardly encouraging as to Wilfred's prospects. Whether disclosure of additional "facts" would have made those prospects appear significantly worse is, however, an issue that must await trial.

The determination of materiality requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Id.*

According to the complaint, Wilfred issued reports suggesting that its prosperity would continue. It was then obliged to reveal any "facts" suggesting otherwise so as to make the matters disclosed not materially misleading.

This court cannot say on the basis of the complaint that plaintiff cannot prove defendants withheld no "material facts." As just one example, plaintiff may be able to show that it was materially misleading for defendants not to have stated that a significant number of Wilfred's sales representatives, contrary to Education Department regulations, received a commission on each student they enrolled in a Wilfred school.

Defendants make other arguments as to the sufficiency of the Rule 10b–5 claim.

### 3. The *Santa Fe* Case

Defendants contend that their purported failure to disclose Wilfred's sloppy practices and lapses of leadership within the company constitutes no more than a common-law claim for mismanagement or breach of fiduciary duty. In *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court held that such claims are not actionable under the federal securities laws.

The allegations in this case bear no resemblance to those at issue in the *Santa Fe* case, which involved a shareholder's objection to the fairness of a short-form merger.

Here plaintiff alleges that defendants knowingly or recklessly sought to conceal a material threat to Wilfred's prosperity in order to inflate the value of their stockholdings and to perpetuate themselves in office. This conduct was " 'designed to deceive or defraud investors by controlling or artificially affecting the price of securities' " and therefore falls within the ambit of the federal securities laws. *Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 12, 105 S.Ct. 2458, 2464, 86 L.Ed.2d 1 (1985) (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976)).

### 4. Disclosures After Plaintiff's Purchase

■ Defendants are correct that any misstatements or omissions made after May 12, 1987, the date of plaintiff's purchase, are not actionable. Such misstatements or omissions were not made "in connection with" that purchase. *See, e.g., Freschi v. Grand Coal Venture,* 767 F.2d 1041, 1049 (2d Cir.1985), *vacated on other grounds,* 478 U.S. 1015, 106 S.Ct. 3325, 92 L.Ed.2d 731 (1986); *Denny v. Barber,* 576 F.2d 465, 468–69 (2d Cir.1978).

### 5. The "Dual Disclosure" and "Buried Facts" Theories

Defendants challenge two theories of liability developed in plaintiff's brief. Defendants have dubbed them the "dual disclosure" theory and the "buried facts" theory.

The "dual disclosure" theory posits that defendants included only rosy information about Wilfred in statements sent to shareholders, such as annual reports, while hiding negative information about the indictments, guilty pleas, and the like in reports sent only to the SEC.

■ The "buried facts" theory is similar. It is that defendants buried negative information in obscure parts of the various reports so that potential purchasers would

overlook it, instead of treating it prominently as befitted its importance.

Defendants argue that these theories are inconsistent with plaintiff's alleged reliance on the integrity of the market.

The complaint asserts that plaintiff "relied, to [his] damage, on the reports and statements described [in the complaint] and/or the integrity of the market price" of the Stock. This alternative pleading gives plaintiff the option of pursuing a "fraud-on-the-market" theory of reliance at trial.

The fraud-on-the-market theory hypothesizes that in efficient capital markets the price of a company's securities reflects all publicly available information about the company. If that information is complete and accurate, investors with no personal awareness of it can nonetheless assume that the market price for the company's stock represents its intrinsic value. In securities-lawyer jargon, such investors "rely on the integrity of the market." *See generally, e.g., In re LTV Sec. Litig.,* 88 F.R.D. 134, 142–45 (N.D.Tex.1980).

If, however, the corporation makes public disclosures that are false or misleading, or fails to disclose material information, the price of its securities will not reflect their true value. The corporation will have perpetrated a "fraud on the market." Even investors who never knew of the misleading disclosures will have been defrauded if they relied on the integrity of the market price. *See id.*

The Supreme Court recently approved the use of the fraud-on-the-market hypothesis to create a rebuttable presumption of reliance in § 10(b) cases. *Basic, supra,* 485 U.S. at ——, 108 S.Ct. at 992.

The 10–K and 10–Q statements provided to the SEC, although not sent to shareholders, were part of the publicly available information presumably reflected in the market price of the Stock. Similarly, the "buried facts" might have escaped individual purchasers' notice, but if the market had access to that information, the price of the Stock would reflect it. *See, e.g., Grossman v. Waste Mgmt., Inc.,* 589 F.Supp. 395, 414 n. 7 (N.D.Ill.1984).

A plaintiff must in the end choose between the fraud-on-the-market theory and a contention that published information did not reach him because it was "buried" or revealed only to the SEC. The two are logically inconsistent.

In any event, the "dual disclosure" theory is hardly helpful to plaintiff. He was not a shareholder before May 12, 1987 and thus would not in any event have received the documents sent to shareholders. Moreover, the relevant documents did not "bury" the negative facts but treated them rather conspicuously.

■ Nevertheless, the fact that plaintiff advanced some unpersuasive arguments in his brief does not make his complaint insufficient.

## C. *The Negligent Misrepresentation Claim*

■ Defendants argue that plaintiff's pendent state law claim for negligent misrepresentation fails to state a claim because they are not in privity with him and therefore owed him no duty under New York law.

To be liable for negligent misrepresentation, defendants must be in privity or "a relationship 'so close as to approach that of privity'" with plaintiff. *Credit Alliance v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 546, 493 N.Y.S.2d 435, 440, 483 N.E.2d 110, 115 (1985) (quoting *Ultramares Corp. v. Touche,* 255 N.Y. 170, 182–83, 174 N.E. 441 (1931) (Cardozo, J.)). Foreseeable reliance on the misrepresentation is not enough. *Id.,* 65 N.Y.2d at 551–53, 493 N.Y.S.2d at 443–44, 483 N.E.2d at 118–19; *White v. Guarente,* 43 N.Y.2d 356, 361, 401 N.Y. S.2d 474, 477, 372 N.E.2d 315, 318 (1977).

"The information is not actionable unless expressed directly, with knowledge or notice that it will be acted upon, to one to whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all." *White, supra,* 43 N.Y.2d at 363, 401 N.Y. S.2d at 478, 372 N.E.2d at 319 (citing *Courteen Seed Co. v. Hong Kong & Shanghai*

*Banking Corp.*, 245 N.Y. 377, 381, 157 N.E. 272 (1927) (Pound, J.)).

In some contexts the New York courts have held a defendant liable where it was not in privity with the plaintiff. *See generally Randy Knitwear v. American Cyanamid Co.*, 11 N.Y.2d 5, 11–16, 226 N.Y.S.2d 363, 366–70, 181 N.E.2d 399, 402–06 (1962) (holding manufacturer of resin liable to retailer of end-product, a fabric treated with the resin). This they have done "to bring the law into harmony 'with modern-day needs and with concepts of justice and fair dealing.'" *Id.*, 11 N.Y.2d at 16, 226 N.Y.S.2d at 370, 181 N.E.2d at 404 (quoting *Bing v. Thunig*, 2 N.Y.2d 656, 667, 163 N.Y.S.2d 3, 11, 143 N.E.2d 3 (1957)).

These cases appear to be limited, however, to situations involving a duty imposed by law, *see White, supra*, 43 N.Y.2d at 362, 401 N.Y.S.2d at 478, 372 N.E.2d at 319, a face-to-face negotiation, *see International Prods. Co. v. Erie R.R. Co.*, 244 N.Y. 331, 338, 155 N.E. 662 (Andrews, J.), *cert. denied*, 275 U.S. 527, 48 S.Ct. 20, 72 L.Ed. 408 (1927); *Glanzer v. Shepard*, 233 N.Y. 236, 238–39, 135 N.E. 275 (1922) (Cardozo, J.), or a breach of a warranty, *see Randy Knitwear, supra*.

A critical factor is whether the plaintiff belongs to "a faceless or unresolved class of persons" or to "a known group possessed of vested rights." *White, supra*, 43 N.Y.2d at 361, 401 N.Y.S.2d at 477, 372 N.E.2d at 318. Only in the latter instance will the New York courts impose liability.

The court has found no cases directly on point. Nonetheless, the court believes that the New York courts would decline to hold defendants liable for negligent misrepresentations to a plaintiff who belongs to a large and "faceless" class of incipient purchasers of a publicly traded security. To impose liability in such an instance would "so expand the field of liability for negligent speech as to make it nearly, if not quite, coterminous with that of liability for fraud," a result against which Justice Cardozo cautioned in the *Ultramares* case and which no New York court has ever endorsed. *Ultramares, supra*, 255 N.Y. at 185, 174 N.E. 441; *see Credit Alliance, supra*, 65 N.Y.2d at 547–48, 493 N.Y.S.2d at 440–41, 483 N.E.2d at 115–16.

The court dismisses the claim for negligent misrepresentation.

## III.

Defendants also move to dismiss the complaint under Rule 9(b) of the Federal Rules of Civil Procedure for failure to plead fraud with particularity.

Rule 9(b) provides that "in all averments of fraud ... the circumstances constituting the fraud ... shall be stated with particularity." The purposes of the rule are (1) to provide a defendant with fair notice of the claims against him; (2) to protect his reputation from harm due to unfounded allegations of fraud; and (3) to reduce the number of strike suits. *E.g., DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). The rule applies to fraud claims brought under § 10(b) of the Act. *See, e.g., Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442, 444–45 (2d Cir.1971).

As discussed more fully in *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962 (E.D.N.Y.1988), *vacated in part on other grounds*, 714 F.Supp. 1285 (E.D.N.Y. June 16, 1989), the pleading need only be sufficiently particular to serve the three purposes of the rule mentioned above. Generally speaking, "defendants must be apprised of the nature of the allegedly false statements, by whom they were made and when, in what manner the statements were false, how they misled plaintiff, and what defendants obtained as a result of the alleged fraud." *The Limited, Inc. v. McCrory Corp.*, 683 F.Supp. 387, 393 (S.D.N.Y. 1988). Plaintiff need not plead his evidence, so long as he gives defendants notice of what they are charged with. *Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir.1985).

### A. *Wilfred and the Inside Directors*

As to Wilfred and the Jakeways, the complaint satisfies those requirements. It identifies and quotes numerous statements in dated SEC filings and annual re-

ports. It describes what "facts" were omitted from those statements. It explains that the omission of those facts misled plaintiff into believing that Wilfred's good fortune would continue, when in fact those sunny prospects were in serious jeopardy. It alleges that the object of the fraud was to induce plaintiff and others to purchase the stock at an inflated price, to perpetuate the individual defendants in office, and to enhance the value of their own holdings in Wilfred.

Although the complaint does not specify how each defendant participated in the fraud, the SEC filings at issue "may be presumed to entail the collective action of the directors, officers, and the accountant," and the complaint need not particularize the role played by each. *Quantum Overseas, N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 667–68 (S.D.N.Y.1987) (quoting *Somerville v. Major Exploration, Inc.,* 576 F.Supp. 902, 911 (S.D.N.Y.1983)); *see DiVittorio, supra,* 822 F.2d at 1247; *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986).

The complaint would have been clearer had it specified which government regulations Wilfred violated. Since plaintiff's concern, however, is with those violations resulting in Wilfred's indictment and its suspension from the Education Department loan programs, defendants are on notice through criminal and administrative process of the particular violations alleged.

Defendants object to plaintiff's having pleaded upon information and belief as to all matters apart from his own acts.

■ Allegations of fraud may not be made on information and belief unless the facts are peculiarly within defendants' knowledge. *DiVittorio, supra,* 822 F.2d at 1247. Plaintiff could have pleaded upon knowledge those matters of which he obviously has knowledge, such as the existence of the various SEC filings and the indictments in Massachusetts and Florida. But pleadings need no longer meet the niceties required by Baron Parke, and the court will not dismiss the complaint over a triviality.

■ Those allegations unrelated to public documents and publicly disclosed events—that is, those related to defendants' knowledge, intent, and role in the fraud—are "peculiarly within defendants' knowledge" and may be pleaded upon information and belief.

The complaint sufficiently states the facts upon which the information and belief are based. *See Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1003–04 (2d Cir.), *cert. denied,* ─ U.S. ─, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988). Those include the guilty pleas of several employees, suggesting that violations of the Education Department regulations had occurred, and the Jakeways' status as high officers and major stockholders in Wilfred, suggesting their knowledge of both corporate practices and Wilfred's failure to disclose them.

■ To state a claim under § 10(b), plaintiff must allege scienter. *Ernst & Ernst, supra.* Rule 9(b) therefore requires him in addition to plead facts giving rise to a strong inference that defendants had knowledge of the facts or recklessly disregarded their existence. *E.g., Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987).

The complaint alleges that "defendants' knowledge and/or reckless disregard of material facts that were misrepresented or omitted ... can be inferred from" their status as "senior officers, directors and/or controlling shareholders of Wilfred." Persons in those positions would have been "knowledgeable concerning the contents of the reports disseminated by Wilfred," concerning its "procedures and practices pertaining to student financial aid," and "about government investigations of such procedures and practices."

The individual defendants' status as corporate insiders, together with these more specific allegations linking their positions to their knowledge, is sufficient to give rise to a strong inference of scienter. *Bernstein, supra,* 702 F.Supp. at 978.

■ As to Wilfred and Jakeway, the Florida indictments of 1988 provide a further basis from which to infer knowledge. Although the indictments are not evidence, they issued upon a grand jury's finding of

probable cause to indict and are thus sufficient for the purposes of Rule 9(b) to support an inference of willful wrongdoing.

■ It would not be useful to require plaintiff to allege exactly what each defendant knew at each moment throughout the four-year Class Period. That information is peculiarly within the knowledge of defendants and cannot be known by plaintiff prior to discovery. *See, e.g., Devaney v. Chester,* 813 F.2d 566, 569 (2d Cir.1987); *DiVittorio, supra,* 822 F.2d at 1247.

■ The complaint also pleads with sufficient particularity the Jakeways' "control person" liability.

Section 20(a) provides that any person who controls a person liable under any section of the Act is jointly and severally liable with the controlled person. 15 U.S.C. § 78t(a). The purpose of the section is "to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir.1973).

"A person's status as an officer, director or shareholder, without more, is not enough to show he controlled the corporation." *Hemming v. Alfin Fragrances, Inc.,* 690 F.Supp. 239, 245 (S.D.N.Y.1988). The complaint must plead that the person had "the power to exercise control over the primary violator, based on a special relationship such as agency or stock ownership." *Index Fund, supra,* 609 F.Supp. at 506.

The complaint alleges that as of April 22, 1988, Jakeway owned 31.1% of the Stock and Jakeway III owned 15.6% of the Stock. The joint ownership by father and son of nearly half of the Stock, together with their high executive offices, suggests that they had the power to exercise control over Wilfred.

The complaint also adequately alleges liability for aiding and abetting a primary violation of § 10(b).

### B. *The Outside Directors*

■ Defendants Colletti, Lovatt, Brodkin, Frank, Rooney, and Albano contend that the allegations are insufficient as to them because they are "outside" directors, not corporate insiders.

According to the complaint, Colletti had retired from his executive position by 1987. The 1986 Annual Report indicates that Lovatt had also retired. Brodkin and Frank have served as counsel to Wilfred throughout the Class Period. Rooney and Albano have been directors since 1984 but, so far as the complaint shows, have never held management positions. None of these defendants holds significant amounts of the Stock.

As to these defendants, the complaint alleges no facts giving rise to an inference that they knew about or recklessly disregarded the fraud. Their status as counsel to and outside directors of Wilfred is not sufficient to infer that they would have known either of Wilfred's practices with respect to student financial aid or whether those practices and their consequences were misrepresented in Wilfred's statements to the investing public. Nor does the complaint allege any facts suggesting that they aided and abetted the fraud or were "control persons" of Wilfred under § 20(a) of the Act. *See Kimmel v. Labenski,* [1987–1988 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 93,651, at 97,990–91, 1988 WL 19229 (S.D.N.Y.1988). The court therefore dismisses the complaint against the outside directors without prejudice.

### IV.

Plaintiff's claim for negligent misrepresentation is dismissed with prejudice. All claims against Colletti, Lovatt, Brodkin, Frank, Rooney, and Albano are dismissed with leave to replead. Defendants' motion is in all other respects denied. So ordered.