Cyrus BHARUCHA and Charles Kesten, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

REUTERS HOLDINGS PLC, Reuters America, Sir Christoper Hogg, Glen Renfrew, Michael Reilly, Nigel L. Judah, Andre F.H. Villeneuve, and John Hull, Defendants.

No. 90 CV 3838 (SJ).

United States District Court, E.D. New York.

Jan. 13, 1993.

**38**

Milberg Weiss Bershad Specthrie & Lerach, David J. Bershad, Steven R. Steinberg, Steven R. Weinmann, and Stull, Stull & Brody, Jules Brody, Melissa R. Emert, Law Offices of Lawrence G. Soicher, Lawrence G. Soicher, New York City, for plaintiffs.

Weil, Gotshal & Manges, Dennis J. Block, Richard L. Levine, Laura A. Cooper, New York City, for defendants.

## MEMORANDUM AND ORDER

JOHNSON, District Judge:

Plaintiffs Cyrus Bharucha and Charles Kesten, on behalf of themselves and the class of stockholders similarly situated, commenced this class action for lost stock value damages against Defendants Reuters Holdings, PLC; Reuters America, Inc.; Sir Christopher Hogg; Glen Renfrew; Michael Reilly; Nigel L. Judah; Andre F.H. Villeneuve; and John Hull. The Complaint alleges statutory securities law violations under Section 10(b) of the Securities Exchange Act of 1934, and Securities and Exchange Commission Rule 10b–5, and common law claims for negligent misrepresentation and fraud. In lieu of answering the Complaint, Defendants filed a motion to dismiss the Complaint pursuant to Fed. R.Civ.P. 12(b)(6) and 9(b). For the reasons stated below, Defendants' motion to dismiss is denied.

## I. BACKGROUND

For the purposes of a motion to dismiss, the Court accepts the factual allegations contained in the Complaint as true. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Reuters Holdings, PLC ("Reuters"), is a British public limited company incorporated under the laws of England, with its principal offices in London. Reuters America, Inc. ("Reuters America") is a wholly owned subsidiary of Reuters and serves a public spokesman for Reuters in the United States. It was responsible for disseminating many of the allegedly misleading statements being sued upon.

During the 1980s, Reuters experienced significant growth with its core business in real time information services. In 1988, Reuters announced the development of a new foreign exchange transaction product called "Dealing 2000." Prior to the introduction of this product, Reuters used Reuters Monitor Dealing Service ("RMDS") which enabled dealers in various countries to contact one another directly in foreign exchange via a special video terminal. Dealing 2000 was intended to replace RMDS. Reuters promoted it as a significant advancement in its transaction products because it would provide automatic matching facilities for foreign exchange transactions. It is alleged that Dealing 2000 was particularly important to Reuters because its core information service prod-

ucts business and customer base began to shrink in the late 1980's.

Dealing 2000 was to be introduced in two phases. The first phase was called Dealing 2000–1. Reuters promoted "as increasing the number of dealing conversations that could be conducted simultaneously." (Complaint ("Compl.") ¶ 25(a).) The second phase, Dealing 2000–2, was promoted by Reuters "as important to its growth in that it would create substantial profits through high-margin transaction fees (a new source of revenue for Reuters) and subscription service revenues." (Compl. ¶ 25(b).)

Between December 1, 1988 and December 4, 1990 ("the class period"), the impending release of this second phase of Reuters foreign exchange product was widely publicized by Reuters. The first statement was made on December 1, 1988 by Glen Renfrew ("Renfrew"), Managing Director and Chief Executive of Reuters, before an audience of securities analysts:

> We see substantial product growth potential in extending to the foreign exchange market what we're already doing in equities with Instinet. That is, earning money from each transaction put through a Reuters exchange system. We propose to do this with our major new foreign exchange transaction product: Dealing 2000. Letters of intent for this service, which we expect to start earning revenue in mid–1989, now total 400. And the first of the new terminals to be used for Dealing 2000 is already in live testing with subscribers in Europe, connected to our existing Dealing network. (Compl. ¶ 27.)

Reuters issued a press release on April 26, 1989 stating:

> Sir Christopher [Hogg] said that despite cost restraints, Reuters had several major new products under preparation for launch in 1989 with the potential to make a substantial contributions to the Company's growth beginning in 1990.

On July 25, 1989 at a securities analyst meeting in New York, Renfrew made the following statement:

> [W]e also expect that there will be a large improvement in the rate of growth

in revenue. And provided the transaction products are successful, provided a lot of people trade in Dealing 2000, then the transaction rate—the activity—is high, then yes, a great deal of that would come through to the bottom line—much more than our margin in the rest of our business. (Compl. ¶ 29.)

At a meeting of securities analysts in New York on December 5, 1989, Renfrew stated:

> We covered the second phase of Dealing 2000, automated trading, which will follow the very successful first phase, in a press statement in November. And, as I said then, we don't expect any significant revenue from that product before the third quarter of next year. That is still the situation. It is still an extremely exciting product; and we're looking forward to this totally new dimension of Reuters' foreign exchange revenue to come on-stream and start making a significant contribution to our growth.

The Complaint alleges that Reuters based its optimistic earnings projections on the imminent successful release of Dealing 2000–2. Defendants repeatedly informed stock market professionals, analysts, money managers, institutional purchasers, and other members of the professional investment community of the status of Dealing 2000–2 and Reuters' near and long-term growth. Companies such as Phillips & Drew International, Ltd., Bear Stearns & Company, Drexel Burnham Lambert, Inc. pointed to Dealing 2000 as an important factor in Reuters growth potential. They recommended Reuters as a potential investment based upon the information Reuters provided. (Compl. ¶ 57(d)(5).) As a result, the price of the ADRs rose from $25¾ to $70⅝.

The class is made up of individuals who purchased Reuters' ADRs during the class period. Class representative Charles Kesten purchased 250 American Depository Receipts ("ADRs") of Reuters on July 7, 1990 at $48 and ⅛. Cyrus Bharucha purchased 50 ADRs on July 23, 1990 at $66 and ⅝ per share. It is alleged that the class members made their purchases in reliance upon Reuters' statements regarding

Dealing 2000 and Reuters' growth potential. Plaintiffs allege that these statements were false and misleading. "A published report as early as May 1, 1989 stated that Reuters in its internal (alpha) testing was having problems with the development of Dealing 2000–2." (Compl. ¶ 35(a).) Nevertheless, Reuters continued to promote it as a product which would produce revenue in 1990 and 1991 without revealing the true extent of the problems with Dealing 2000.

Finally, in October 1990 Reuters disclosed that it would not introduce Dealing 2000 as scheduled and that its introduction would be delayed for at least six months. The price of Reuters' ADRs fell to $32⅝. At a meeting of securities analysts in New York on December 4, 1990 Renfrew admitted that the delay was caused by the need '... to introduce additional and speedier operational safeguards against broken trades, and to make other enhancements.' Reuters also revealed its revenue growth would be only 4% higher in 1991 and that Dealing 2000–2 would not add significant amounts of revenue for 1991.

## II. ANALYSIS

### A. Securities And Exchange Act Violations

#### 1. Rule 12(b)(6)

■ Defendants seek to dismiss the Complaint under Fed.R.Civ.P. ("Rule") 12(b)(6) for failure to state a cause of action. On a motion to dismiss, the court must limit its analysis to the four corners of the complaint, see *Cortec Industries, Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 44 (2d Cir.1991), and must accept plaintiffs' allegations of fact as true together with such reasonable inferences as may be drawn in its favor. *Stewart v. Jackson & Nash*, 976 F.2d 86, 87 (2d Cir.1992); *LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir.1991). A complaint should be dismissed only when it is clear that the plaintiff can prove no set of facts upon which he would be entitled to relief. *Conley v. Gibson*, 355 U.S. at 45–6, 78 S.Ct. at 102.

■ Plaintiffs' first cause of action states a claim under Section 10(b) and SEC

Rule 10b–5. Section 10(b) of the Securities and Exchange Act states that it is "unlawful for any person ... to use or employ ... any manipulative or deceptive device or contrivance in contravention of" Securities and Exchange Commission rules. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 471, 97 S.Ct. 1292, 1299, 51 L.Ed.2d 480 (1977). The proscribed manipulations include 'practices ... that are intended to mislead investors by artificially affecting market activity.' *Cowen & Co. v. Merriam*, 745 F.Supp. 925, 929 (S.D.N.Y.1990). SEC Rule 10b–5 prohibits any 'artifice to defraud' or any act 'which operates or would operate as a fraud or deceit' in connection with the purchase or sale of a security. *Id.*

The elements of a claim for damages under 10(b) and Rule 10b–5 are (1) damage to plaintiff, (2) caused by reliance on defendant's misrepresentations, or omissions of material facts, (3) scienter, (4) in connection with the purchase or sale of securities, (5) furthered by defendant's use of the mails or any facility of a national securities exchange. *Cowen & Co. v. Merriam*, 745 F.Supp. at 929, *citing Bochicchio v. Smith Barney, Harris Upham & Co.*, 647 F.Supp. 1426, 1429 (S.D.N.Y.1986). Reuters does not dispute that the plaintiffs have sufficiently demonstrated damage, reliance and Reuters' use of a national securities exchange. Defendants' arguments in favor of dismissing the complaint · questions whether Plaintiffs have satisfied the element of "scienter" and the requirement that the misstatement have some "connection with the purchase or sale of securities."

■ Defendants assert that the Plaintiffs' statutory claims should be dismissed for failure to state a cause of action because their statements with regard to the Dealing 2000–2 product and its expected impact on earnings amounted to opinion and forecasts which are not actionable. "Forecasts represent an opinion about what may happen in the future and therefore differ from statements regarding 'hard' facts that are knowable at the time they are made. However, forecasts con-

tain implicit representations that they were made in good faith and were based upon a reasonable method of preparation, and those representations constitute 'facts' actionable under Rule 10b–5." *Estate of Detwiler v. Offenbecher,* 728 F.Supp. 103, 137 (S.D.N.Y.1989). The facts implicit in forecasts are linked to the scienter requirement of a securities fraud claim. *Id.*

The Complaint recites numerous allegations of the facts underlying the representations made by Reuters. Plaintiffs allege that Reuters repeatedly touted Dealing 2000 as an important advancement in its transaction products during the class period. As a result, the price of Reuters ADRs rose from \$25¾ to \$70⅝. Throughout the early part of 1990, Reuters predicted that Dealing 2000–2 would begin to contribute to its revenue stream by the third quarter of 1990. In turn, the investment community pointed to the Dealing 2000 as a key to Reuters' double digit growth by the early 1990's. The Complaint alleges that the Defendants knew or should have known that their statements were misleading because Dealing 2000–2 had not reached the point were it could be released for customer testing. A published report indicated that there were problems with the development of Dealing 2000–2 as early as May 1, 1989. Therefore, the Court concludes that the Plaintiffs have satisfied the "scienter" requirement.

█ The Defendants also argue that statements made after the date the class representatives purchased Reuters' ADRs are not actionable because the Bharucha and Kesten purchases were not made in reliance upon them. This argument would be persuasive if Bharucha and Kesten were bringing this action solely as individuals. In a class action where the class representative sues on behalf of a class of persons who purchase stock during the entire class period, post-statements are relevant to the course of wrongful conduct alleged. *See Nicholas v. Poughkeepsie Savings Bank/ FSB,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 95,606, 1990 WL 145154 (S.D.N.Y. Sept. 27, 1990). If Defendants argument were taken to its natural conclusion, only those

individuals who purchased stock on the last day of the class period could act as a representative of the class. Bharucha and Kesten have alleged that Reuters engaged in a common course of conduct to mislead the Plaintiff class. *Id.* Therefore, even those statements made after their purchases are actionable. Based on the foregoing set of facts, the Court must find that the Plaintiff has succeeded in stating a claim under 10(b) and 10b–5.

### 2. Rule 9(b)

█ Defendants also seek to dismiss the securities fraud claim for failure to plead fraud with particularity under Rule 9(b). Rule 9(b) was promulgated to ensure that (1) defendants get fair notice of plaintiffs' claim; (2) defendants' reputation or goodwill is protected; and (3) to reduce the number of strike suits. *Cosmas v. Hassett,* 886 F.2d 8, 10–11 (2d Cir.1989); *Certilman v. Hardcastle, ltd.,* 754 F.Supp. 974, 978 (E.D.N.Y.1991). Allegations of fraud must be specific enough to give defendants "a reasonable opportunity to answer the complaint" and must give defendants "adequate information" to allow defendants to frame a response. *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). On a Rule 9(b) motion, the court must "read the complaint generally and draw all inferences in favor of the pleader." *Cosmas,* 886 F.2d at 11. Rule 9(b) requires that the time, place, speaker, and sometimes even the content of the alleged misrepresentation must be alleged specifically. *Id.*

█ After reviewing the Complaint, the Court finds that it satisfies Rule 9(b). Plaintiffs have painted a picture from which it is not unreasonable to infer that Defendants had knowledge of the defects in Dealing 2000–2 when they continued to promote it as a product which would produce revenue in late 1990 and early 1991. The Complaint alleges that the Defendant made numerous statements and provides the time, place, speaker and content of each statement. Many of the allegations in the Complaint are pled upon information and belief. Where as here the facts evidencing fraud are almost exclusively within

Reuters' knowledge, pleading on information and belief is appropriate. *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (1990). Furthermore, the Court finds that the Complaint adduces specific facts supporting a strong inference of fraud. *See Wexner v. First Manhattan Co.*, 902 F.2d at 172. Therefore, the Complaint adequately provides Defendants with notice of the allegations they must answer and satisfies Rule 9(b).

### B. *Negligent Misrepresentation*

Defendants contend that the negligent misrepresentation claim should be dismissed because there is an absence of privity between the defendants and the plaintiffs. New York courts have refused to hold defendants liable "to a plaintiff who belongs to a large and 'faceless' class of incipient purchasers of a publicly traded security." *Ballan v. Wilfred American Educational Corp.*, 720 F.Supp. 241 (E.D.N.Y.1989). This argument may be valid if this Court finds that New York law applies. Many courts choose to wait and decide the choice of law issue when the plaintiff moves for Rule 23 certification. *See Zimmerman v. Prime Medical Services, Inc.* 729 F.Supp. 23, 26 (S.D.N.Y.1990). This Court chooses to do the same.

### C. *Common Law Fraud Claim*

Defendants also seek to dismiss Plaintiffs' common law fraud claim pursuant to Rule 9(b) for failure to plead fraud with particularity. The Court has already discussed the standards for Rule 9(b). Because the elements of the common law fraud claim are almost identical to those of the securities fraud claim, the Court finds that the Plaintiffs' common law fraud claims meets the standards of Rule 9(b) for the reasons stated earlier.

### III. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is hereby denied.

So Ordered.