### In re PAR PHARMACEUTICAL, INC. SECURITIES LITIGATION.

#### No. 88 Civ. 8154 (RPP).

United States District Court, S.D. New York.

March 16, 1990.

As Amended March 21, 1990.

Garwin, Bronzaft, Gerstein & Fisher by Bruce E. Gerstein and Wechsler Skirnick Harwood Halebian & Feffer by Robert Harwood, New York City, for plaintiffs.

Solin & Breindel by Kenneth I. Schacter, New York City, for Par Pharmaceutical, Inc., Quad Pharmaceutical, Inc. and Perry Levine.

Milbank, Tweed, Hadley & McCloy by Adlai S. Hardin, Jr., New York City, for defendant R.K. Patel.

Wiley Rein & Fielding by Walter J. Andrews, Washington, D.C., for defendant Ashok Patel.

Weil Gotshal & Manges by Nancy E. Barton, New York City, for Jacob Robbins.

Zuckerman, Spaeder, Goldstein, Taylor & Kolker by Stephen H. Glickman, Washington, D.C. (Deborah J. Jeffrey, of counsel), for defendant Dilip P. Shah.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Plaintiffs, asserting violations of the federal securities laws and RICO, bring this

class action on behalf of purchasers of the common stock of Par Pharmaceutical, Inc. ("Par") during the period December 29, 1986 to April 18, 1989.[1] The class has yet to be certified. The defendants now move under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure to dismiss the Consolidated Amended and Supplemental Class Action Complaint ("complaint").[2]

Plaintiffs are investors in Par, a corporation engaged in the manufacture and sale of generic drugs. Plaintiffs allegedly purchased Par's stock at inflated prices because Par's public statements and its filings with the Securities and Exchange Commission failed to disclose that Par and its subsidiary had made illegal payments to government officials to expedite approval of the companies' applications for permission to manufacture certain drugs. After information concerning the alleged payments was publicly disclosed, the price of Par's stock fell dramatically. Plaintiffs assert violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5 promulgated thereunder, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), (d), and common law fraud, deceit and negligent misrepresentation.

## I. BACKGROUND

Defendant Par is a corporation in the business of manufacturing and marketing prescription and over the counter oral and topical generic drugs. Par owns 60% of a subsidiary, Quad Pharmaceutical, Inc. ("Quad"), which manufactures and markets injectable generic drugs. The individual defendants Perry Levine, Ashok Patel ("A. Patel"), R.K. Patel and Jacob Robbins (collectively the "Director Defendants") constituted the entire Board of Directors of Par from the beginning of the alleged class period until December, 1988. All except Robbins were also officers of Par.[3] Defendant Dilip P. Shah was President and Chief Executive Officer of Quad from April 1985 until July 14, 1989, and was responsible for all regulatory aspects of Quad's product development. Complaint at ¶¶ 6–14.

In connection with their businesses, Par and Quad are required to obtain approval of their products from the Food and Drug Administration ("FDA"). As a prerequisite for FDA approval, Par and Quad must demonstrate that their manufacturing facilities meet FDA requirements and that their generic drug products are safe and effective. *Id.* at ¶¶ 33–37.

The 62–page complaint alleges that, as with all generic drug companies, Par's financial well being was dependent upon its ability to obtain continually first or early FDA approval for new products, and that defendants were "well aware of the necessity for expediting FDA approval of new Products."[4] *Id.* at ¶¶ 39–40.

According to the complaint, defendants A. Patel and Shah made a series of 14 illegal payments to two FDA employees, beginning some time in 1986 and continuing until March, 1988, for the purpose of

---

**1.** On June 22, 1989, the Court ordered five actions against Par to be consolidated for purposes of discovery and pre-trial motions. On July 24, 1989, plaintiffs filed a Consolidated Amended and Supplemental Class Action Complaint.

**2.** Defendants Par, Quad Pharmaceutical and Perry Levine (the "Par defendants") have moved as a group and have filed a single memorandum of law. Defendants Dilip P. Shah, R.K. Patel, and Jacob Robbins have separately made motions to dismiss and filed memoranda of law. Defendant Ashok Patel also separately moves to dismiss, but adopts the memorandum of law of the Par defendants.

**3.** The Director Defendants are alleged to have beneficially owned 32.34% of Par's common stock as of January 13, 1988.

**4.** The complaint cites Par's Annual Report (Form 10–K) for the fiscal year ended October 1, 1988, which stated that

> [T]he Company believes that the nature of its business ... is dependent on the Company's ability to obtain FDA approval of new products and to market them soon after patent expiration.
>
> \* \* \* \* \* \*
>
> [T]he ability of the Company to continually introduce new products as quickly as possible after their patents expire is essential to the maintenance of its gross profit margins.

Complaint, ¶ 40.

securing expedited approval of Par products and to delay the approval of competing products. It is further alleged that the bribery scheme allowed Par to obtain FDA approval for the manufacture of a number of generic products before certain of its competitors. *Id.* at ¶¶ 56–65.

All of the defendants allegedly "were aware of the bribery scheme and its potential consequences or recklessly disregarded its existence." *Id.* at ¶ 88. In support of this contention, the complaint asserts that Quad and/or Par, Levine, R.K. Patel and Robbins "delegated full authority" to A. Patel and Shah "to determine Par's course of conduct concerning the company's activities in regard to obtaining expedited approval from the FDA of Par Products." *Id.* The complaint also states that Par and the Director Defendants, as a matter of company policy, "developed, refined, supervised, implemented and/or acquiesced to the bribery scheme ...," and calls defendants Quad and Shah "knowing and direct participants in the bribery scheme." *Id.* at ¶ 124–125.

Plaintiffs also allege that, in conjunction with the bribery scheme, the defendants determined to create the illusion within the investment community that Par had a special expertise in obtaining expeditious FDA approvals of its products and that this expertise would result in continued growth and income. Their purpose was to inflate artificially the price of Par's common stock. *Id.* at ¶ 123.

To that end, it is alleged, defendants falsely represented, in a series of public filings and other public statements during 1987 and 1988, that the company's ability to secure speedy FDA approval for its products was because of Par's "legitimate business acumen and ingenuity," rather than the illegal payments, and failed to disclose that projections of Par's future prospects "were based on past illegal activities" that, once revealed, "could not be sustained," and that subjected Par to the "prospect of serious criminal penalties and sanctions." *Id.* at ¶ 67–90.

In June 1988, three months after the illegal payments to FDA officials stopped, the United States Congress began an investigation of the generic drug approval process at the FDA. On July 5, 1988, records of Par were subpoenaed in connection with that investigation. Par did not disclose this event, or make any reference to the alleged bribery scheme, in its July 1988 10–Q. *Id.* at ¶¶ 92–93.

On August 15, 1988, Par disseminated its July 1988 Quarterly Report, which acknowledged the fact of the congressional investigation, but stated that "we are not aware of any instances of the favoritism that has been alleged in the investigation." *Id.* at ¶¶ 94–95.

On October 21, 1988, Par issued a press release stating that it had been informed by the United States Attorney in Maryland that Par, Quad and one of Quad's executives were "targets" in an ongoing Grand jury investigation relating to improper payments to employees of the FDA's generic drug division, and went on to say that Par "had no reason to believe that this matter would have any immediate impact upon its business or that of Quad." *Id.* at ¶¶ 95–96.[5]

In April 1989, A. Patel and Shah agreed to plead guilty in connection with the grand jury investigation.[6] In July 1989, Par and

---

**5.** As discussed in further detail *infra,* the following documents disseminated by Par while the bribery scheme was in operation are alleged to contain false and misleading statements: the 1986 From 10–K; the 1986 Annual Report to Shareholders; the Quarterly Report to Shareholders for the Second Quarter of 1987; the 1987 Form 10–K; the 1987 Annual Report to Shareholders; a July 27, 1987 press release; the 1988 Annual Report to Shareholders; and statements made in a May 31, 1988 *Financial World* article.

Plaintiffs also claim that the July 1988 Quarterly Report and the October 21, 1988 press release were fraudulent.

**6.** The complaint alleges that A. Patel pleaded guilty on July 17, 1989 to making illegal cash payments totaling $2,900 on six different occasions between July 1987 and April 1988 to an FDA employee named Charles Chang, and to making four such payments totaling $1,000 to another FDA employee, David Brancato. Brancato allegedly pleaded guilty on May 17, 1989 to three counts of receiving unlawful gratuities in

Quad agreed to plead guilty to one count of providing an unlawful gratuity totaling $1,500 to an employee of the FDA. As a consequence of the agreement, Par and Quad face fines up to $500,000 each. *Id.* at ¶¶ 97, 99.[7]

Prior to the inception of the scheme to bribe FDA employees, Par had experienced limited success in securing FDA approval for its products. During the period the bribery scheme was in operation, Par's and Quad's success in obtaining rapid approvals improved dramatically, as did their earnings and sales. After the bribes ceased, the pace at which Par and Quad were receiving approvals subsided, earnings and sales declined, and the market price of Par common stock, which had traded as high as 27.25 per share during the class period, eventually fell to $8 per share. *Id.* at ¶¶ 55, 87, 100, 103.

According to the complaint, Par and each of the Director Defendants "participated in, aided and abetted, controlled and/or acquiesced in Par's dissemination of the false and misleading statements," *id.* at ¶ 122, and "knew, or but for a reckless disregard for the truth should have known of the falsity of the material misstatements and omissions," *id.* at 124, and knew that such misstatements would injure the integrity of the market for Par's stock and inflate the price of Par common stock. *Id.* at ¶ 126.

On the basis of these allegations, plaintiffs assert the following claims: (i) violations of Sections 10(b) and 20(a), and Rule 10b–5 promulgated thereunder, on the part of all defendants; (ii) violations of Sections 1962(c) and (d) of RICO, on the part of defendants Levine, A. Patel, R.K. Patel, Robbins, Quad and Shah; (iii) common law fraud and deceit on the part of all defendants; and (iv) negligent misrepresentation on the part of Par, Levine, A. Patel, R.K. Patel and Robbins.

Defendants move to dismiss the entire complaint on the grounds that it does not state a cause of action. For these purposes, the Court accepts the allegations of

the complaint as true. *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969). The motions to dismiss must be denied unless it appears that plaintiffs can prove no set of facts in support of their claim which would allow them to recover. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

## II. THE SECURITIES FRAUD CLAIMS

Defendants argue that Count I of the complaint, which asserts violations of Sections 10(b) and 20 of the Exchange Act and Rule 10b–5 promulgated thereunder against all of the defendants, fails to state a claim upon which relief can be granted.

Plaintiffs argue that the complaint alleges sufficiently that financial statements and reports issued by Par extolling the company's ability to obtain future FDA approvals expeditiously omitted facts that would make the statements not misleading due to the failure to disclose that Par's track record for securing FDA approvals quickly was the product of the illegal bribery scheme. Plaintiffs also say the complaint alleges that defendants continually linked the importance of obtaining expeditious FDA approvals to Par's favorable financial performance.

### A. Duty to Disclose

■ A party charged with failing to disclose material information must be under a duty to disclose it in order to be held liable under Rule 10b–5. *Chiarella v. United States*, 445 U.S. 222, 228–29, 100 S.Ct. 1108, 1114–15, 63 L.Ed.2d 348 (1980), citing *Frigitemp Corp. v. Financial Dynamics Fund*, 524 F.2d 275, 282 (2d Cir.1975). Defendants argue that no such duty arose in this case.

■ Defendants rely heavily on a line of cases holding that a corporation is under no duty to announce publicly that it or its officers are guilty of uncharged criminal

---

connection with the payments made by A. Patel and Shah.

7. The complaint does not indicate whether Shah, Par or Quad ever actually entered the pleas contemplated in the agreements.

behavior, or to accuse itself of antisocial or illegal policies. *See Roeder v. Alpha Industries, Inc.,* 814 F.2d 22, 26–28 (1st Cir. 1987); *United States v. Matthews,* 787 F.2d 38, 49 (2d Cir.1986); *GAF Corp. v. Heyman,* 724 F.2d 727, 740 (2d Cir.1983); *Amalgamated Clothing and Textile Workers Union v. J.P. Stevens & Co.,* 475 F.Supp. 328, 331–32 (S.D.N.Y.1979), *vacated as moot,* 638 F.2d 7 (2d Cir.1980); *Crouse–Hinds Co. v. InterNorth, Inc.,* 518 F.Supp. 416, 475 (N.D.N.Y.1980). However, these cases are not dispositive here. The illegality of corporate behavior is not a justification for withholding information that the corporation is otherwise obligated to disclose. *See also Roeder,* 814 F.2d at 25 ("The securities laws do not operate under the assumption that material information need not be disclosed if management has reason to suppress it."); *Ballan v. Wilfred American Educational Corp.,* 720 F.Supp. 241, 249 (E.D.N.Y.1989) ("The fact that a defendant's act may be a crime does not justify its concealment.").[8]

▆ According to plaintiffs, Par's obligation to disclose the bribery scheme and its probable effects on the corporation arises from that portion of Rule 10b–5 requiring disclosure of additional facts "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Under this provision, even though no duty to make a statement on a particular matter has arisen, once corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading. *Securities and Exchange Commission v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 860–862 (2d Cir.

1968) (*en banc*), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *Schlanger v. Four–Phase Systems, Inc.,* 582 F.Supp. 128, 133 (S.D.N.Y.1984). *See also Basic, Inc. v. Levinson,* 485 U.S. 224, n. 17, 108 S.Ct. 978, n. 17, 99 L.Ed.2d 194 (1988) ("the ever-present duty not to mislead").

The complaint alleges that defendants' public disseminations touting Par's and Quad's competitive advantage in obtaining speedy FDA approvals and Par's earnings performance were false and misleading because defendants' failed to disclose (1) that such advantage was obtained through an illegal scheme of bribes rather than through defendants' expertise and business acumen, and (2) that the public disclosure and/or termination of the bribery scheme would have a profound harmful effect on Par's sales, profit margins and earnings. Complaint ¶¶ 67–83.

### 1. The Statements

Briefly, the 62–page complaint alleges that defendants made the following public statements that were false and misleading because they did not disclose the existence of the bribery scheme:

(1) Par's 1986 10–K, filed with the SEC on or about December 29, 1986, stated that during the 1986 fiscal year ending September 27, 1986 Par had received FDA approval for the manufacture of 37 tablet and capsule products and 40 injectable products; compared the 37 approvals for tablets and capsules in fiscal 1986 to the 13, 24 and 15 such approvals received in 1983, 1984 and 1985, respectively; and it further stated that, to date, Quad had received

---

**8.** Defendant R.K. Patel argues that, even if a duty to disclose arose under the federal securities laws, his fifth amendment privilege against self-incrimination prevents the imposition of personal liability against him. However, he cites no authority for the proposition that a person may mislead the investing community with impunity merely because the information necessary to make the statements not misleading may include incriminating information. Rather than force him to incriminate himself, the federal securities laws require him to re-

frain from issuing misleading statements. He did not have to permit the issuance of the misleading statements which created the duty to disclose the incriminating information. The decision in *United States v. Matthews,* 787 F.2d 38 (2d Cir.1986), on which R.K. Patel relies in support of his argument, is not inconsistent with this statement of the law. Furthermore, R.K. Patel never asserted his fifth amendment privilege as a ground for not disclosing the information at the time disclosure was called for. *See Ballan,* 720 F.Supp. at 248.

approvals for 67 injectable products. Complaint at ¶¶ 67–69, 89, 106.

(2) In a letter included in the 1986 Annual Report to Shareholders, also issued on December 29, 1986, defendant Levine noted that a trade journal had reported that the Par/Quad combination "led the industry in obtaining approvals from FDA in 1986," and that "our number of approvals was almost double that of our nearest competitor. This is an achievement in which we take great pride and we will do our best to repeat it in 1987." The letter also noted the increase in FDA approvals over 1985, noted Quad's ability to obtain approvals for injectable products since January 1986, and stated that, in the first quarter of fiscal 1987, Par continued to receive numerous approvals from the FDA. *Id.* at ¶¶ 70–76, 89–90, 107–109.

(3) In Par's Quarterly report to Shareholders for the Second Quarter ended March 28, 1987, it was reported that Par "continued to set records" in sales and earnings and that Par received FDA approvals for 27 new products. *Id.* at ¶ 77, 89, 110.

(4) Par's 1987 10–K, filed with the SEC on January 11, 1988, and its 1987 Annual Report to Shareholders again emphasized the Company's success in obtaining FDA approvals, stating that it had received approvals for the manufacture of 26 tablet and capsule products and 65 injectable products. The Annual Report also noted that sales and net income had almost doubled from the previous year and stated that "[o]ur 1987 progress reflects the FDA's approval of a record number of new products". *Id.* at ¶ 78–80, 89–90, 111–114.

(5) In a press release issued on or about July 27, 1987, Par reported a quarterly earnings increase of more than 100 percent and defendant Levine stated that "the Par/Quad combination received almost twice as many approvals as any other generic drug manufacturer." *Id.* at ¶¶ 81, 89, 115.

(6) In a letter included in Par's 1988 Annual Report to Shareholders, issued January 17, 1989, defendant Levine stated that "[o]ur product approvals continued, and in January 1988, trade publications reported that the Par/Quad combination had outpaced the industry in calendar 1987—for the second consecutive year—in obtaining approvals for generic products." *Id.* at ¶¶ 83, 89, 117.

(7) In its July 1988 10–Q, Par failed to disclose the receipt of the congressional subpoena, the likelihood of government action against Par that the subpoena portended, and the impact on the financial condition of Par that would result from a discontinuance of its bribery scheme. *Id.* at ¶ 93.[9]

(8) The letter to shareholders from Levine that accompanied the July 1988 Quarterly Report, disseminated on August 15, 1988, although it acknowledged the fact of the congressional investigation, misrepresented the significance of that investigation to Par, and misrepresented the likelihood that the government would take action against Par. In particular, the letter states:

> In connection with [the congressional] investigation, we have been asked to provide, and have provided, certain documents ... we have stated publicly that we are not aware of any instances of the favoritism that has been alleged in the investigation, are not aware of any allegations against Par, and expect to cooperate in the investigation.

Complaint at ¶¶ 94, 118.

(9) The October 21, 1988 press release states that Par did not believe the grand

---

**9.** It is not clear from the complaint whether plaintiffs are asserting a cause of action with respect to the July 1988 10–Q. It is not included in the section of the complaint entitled "Misrepresentations and Omissions." Complaint at ¶¶ 104–120. Defendants point out that the subpoena was not received until July 5, 1988, three days after the close of the period on which the July 1988 10–Q reported, and that the subpoena was disclosed on August 15, 1988, just four days after the July 1988 10–Q was filed with the SEC. Plaintiffs have not responded to defendants' arguments or attempted to show that there was any duty to disclose the receipt of the subpoena in the July 1988 10–Q. Accordingly, defendants' motion to dismiss is granted with respect to the July 1988 10–Q.

jury investigation would have any immediate impact on Par's or Quad's business, although in fact the grand jury investigation threatened Par's relationship with the FDA and FDA employees and Par's future ability to obtain FDA approval for its products, and Par knew or should have known that criminal action against Par and/or Quad and/or their employees was reasonably likely to follow. *Id.* at ¶¶ 95–96, 119.

Plaintiffs also contend that the following projections made by defendants were false and misleading because they were based on illegal activities which could not be sustained once the illegal scheme was uncovered and subjected Par to the prospect of serious criminal penalties and sanctions:

(1) In its 1986 Annual Report, Par stated that "[a]n extraordinary record for successful application has positioned Par to capitalize on the fast-growing generic market...." *Id.* at ¶¶ 74, 90, 108.

(2) In the 1987 Annual Report, defendant Levine stated in a letter to shareholders that "we anticipate that the stream of product approvals that has made us the industry leader in this crucial aspect of our business will continue as we keep expanding our product lines." *Id.* at ¶¶ 80, 90, 114.

(3) On or about May 31, 1988, in a *Financial World* article, defendant Levine projected that "Par will also benefit from the introduction of our new liquid and topical product lines. We therefore look for renewed momentum for growth in the coming year." *Id.* at ¶¶ 82, 90, 116.

### 2. Were the Statements Misleading?

Plaintiffs acknowledge that some of the statements they claim were "false and misleading" were literally true, but claim these statements were essentially "half-truths", and thus misleading and actionable under Rule 10b–5. Defendants argue the statements were not misleading as a matter of law and therefore the defendants were under no duty to make any additional disclosures.[10]

■ A statement is misleading if a reasonable investor, in the exercise of due care, would have received a false impression from the statement. *Texas Gulf Sulphur*, 401 F.2d at 862; *Levine v. NL Industries, Inc.*, 717 F.Supp. 252, 256 (S.D.N.Y.1989). Because this determination requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts," *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976), it is generally a question of fact for the jury. *See Texas Gulf Sulphur*, 401 F.2d at 863 (remanding to the district court, the trier of fact, to apply "the standard of whether the reasonable investor, in the exercise of due care, would have been misled by [the press release]."). *See also TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. at 450, 96 S.Ct. at 2132 (issue of materiality is a mixed question of law and fact that is generally for the jury).

Thus, the matter must go to the jury unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that reasonable minds could not differ on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made. *TSC Industries*, 426 U.S. at 450, 96 S.Ct. at 2132; *Goldman v. Belden*, 754 F.2d 1059, 1067–68 (2d Cir. 1985). If the Court so decides, then the statements are not misleading as a matter of law.

■ The Court concludes that a reasonable jury could find these statements, except for those discussed *infra*,[11] to have been misleading to a reasonable investor, in light of the circumstances under which they were made. A reasonable jury could find that, by extolling Par's ability to obtain FDA approvals, by comparing Par's

---

**10.** Defendants make no arguments in their briefs as to why the complaint's allegations in ¶¶ 91–101, 118–19 of the complaint, which pertain to Par's statements after it had received the government subpoena, fail to state a cause of action and, therefore their motion to dismiss the complaint is denied with respect to those allegations.

**11.** *See also* note 9, *supra*.

success in this regard to other companies in the industry and to its own previous performance, and by projecting continued success in obtaining rapid approvals, the statements conveyed to a reasonable investor the false impression that Par had a particular expertise in obtaining FDA approvals constituting a legitimate competitive advantage over other companies and that this advantageous expertise was responsible for its success in obtaining FDA approvals.

■ The situation is somewhat different with respect to defendant Levine's statements appearing in the *Financial World* article. That statement amounted to nothing more than a projection of "renewed momentum for growth in the coming year," and as such is not misleading in any discernible way. The subject matter of the statement is so attenuated from the bribery scheme that it could not reasonably be found to have created a false impression in a reasonable investor. Thus, the allegations in ¶¶ 82, 90, and 116 of the complaint, taken together, fail to state a cause of action for violation of Section 10(b) of the Securities Exchange Act.

■ Additionally, plaintiffs' contention that the documents Par disseminated to the public or filed with the SEC should have predicted the consequences of discovery of the bribery scheme and its cessation cannot be the basis of Rule 10b–5 liability. Plaintiffs argue the defendants should have disclosed to the investment community "the profound harmful effect that the public disclosure and/or termination of the bribery scheme would have on Par's sales, profit margins and earnings." Plaintiffs' Brief in Opposition to Defendants R.K. Patel's and Jacob Robbins' Motions to Dismiss at 7. However, the company was not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might have befallen the company if the bribery scheme was discovered, disclosed or terminated. *See Ballan v. Wilfred American Edu-*

*cational Corp.*, 720 F.Supp. at 248 ("defendants were not bound to predict as the 'imminent' or 'likely' outcome of the investigations that indictments of defendants and its chief officer would follow, with financial disaster in their train."). Defendants cannot be held liable for failing to "disclose" what would have been pure speculation. *See Fisher v. Plessy Co., Ltd.*, 559 F.Supp. 442 (S.D.N.Y.1983); *Schwartz v. Novo Industri A/S*, 658 F.Supp. 795, 798–99 (S.D.N.Y.1987). Consequently, the Court holds that the allegations in ¶¶ 74, 80, 90, 108, 114, and ¶ 120(b)–(d) of the complaint, taken together, do not state causes of action for securities fraud under Section 10(b) of the Securities Exchange Act.

The remaining misleading statements alleged in the complaint relates to Par's success in obtaining expeditious approvals. As to those remaining statements, then, plaintiffs must be allowed to present to the jury their proof that the statements were misleading to a reasonable investor, in light of the circumstances under which they were made.[12]

■ In his brief, defendant R.K. Patel argues that the statements were not rendered misleading by the failure to disclose the bribery scheme because there is no "logical nexus" between the bribery scheme and the subject matters of the statements complained of. He argues it is pure speculation that Par's sales or earnings or FDA product approvals were a consequence of participation in the bribery scheme, and therefore it is also pure speculation that the statements were misleading absent disclosure of the scheme. Since the securities laws do not require the disclosure of speculation or conjecture, he concludes these statements were not misleading.

This, however, is also a question for the jury. Plaintiffs allege in their complaint that the sales, earnings and product ap-

12. The statements at issue here need not stand or fall as a group; the jury could find that only those that compared Par's product approvals to those of other companies were misleading, or that only those that cited Par's approval rate as evidence for future success were misleading, or the jury could find that, under the circumstances, even those that simply stated the number of approvals Par received in a given time period were misleading.

provals which the company mentioned in its various statements were the result of the bribes paid to FDA officials, and that the defendants knew this to be true at the time they issued the statements. Plaintiffs are entitled to attempt to prove those contentions to the jury. Defendants are equally entitled to attempt to persuade the jury to infer otherwise.

To summarize, defendants' motions to dismiss Count I of the complaint are granted with respect to the allegations in ¶¶ 82, 90 and 116 that the statements in the *Financial World* article violated Rule 10b–5, and with respect to its allegations in ¶¶ 74, 80, 90, 108, 114 and ¶ 120(b)–(d) that defendants should have speculated as to the effects the bribery scheme, or its discovery or termination or disclosure, would have on the company. The allegations of the complaint are otherwise sufficient to withstand defendants' motions to dismiss for failure to state a claim under Rule 10b–5.

### B. Secondary Liability

Defendants R.K. Patel and Robbins move to dismiss the complaint to the extent that it asserts secondary liability against them as controlling persons under § 20(a) of the Securities Exchange Act of 1934 and as aiders and abettors. Defendant Shah moves to dismiss the complaint to the extent it asserts "aiding and abetting" liability against him. Defendants Levine and Quad join in Shah's motion.

 Section 20(a) holds liable every person who "controls" any other person found liable under the 1934 Act, "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). To withstand a motion to dismiss, a plaintiff must plead facts from which it can be inferred that the alleged controlling person had the power to control or influence, directly or indirectly, the corporation or its management, and that the person was a culpable participant in the primary violation. *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir.1973); *Gordon v. Burr*, 506 F.2d 1080, 1085–86 (2d Cir.1974); *Metzner v. D.H. Blair & Co.*,

689 F.Supp. 262 (S.D.N.Y.1988). *See also Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441–42 (9th Cir.1987); *Harrison v. Enventure Capital Group, Inc.*, 666 F.Supp. 473, 478–79 (W.D.N.Y.1987); *Savino v. E.F. Hutton & Co.*, 507 F.Supp. 1225, 1243 (S.D.N.Y.1981).

 With respect to the first requirement, that the person have the power to control the company or its management, the law is settled that a person's status as a director does not alone amount to the requisite power to control. *See Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir. 1984) (citing cases); *Hemming v. Alfin Fragrances, Inc.*, 690 F.Supp. 239, 245 (S.D.N.Y.1988); *Kimmel v. Labenski*, [1987–1988 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 93,651 at 97,990, 1988 WL 19229 (S.D.N.Y. Feb. 10, 1988). Something more must be alleged in order to state a § 20(a) controlling person claim.

Plaintiffs must also allege that these defendants were "in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Lanza v. Drexel*, 479 F.2d at 1299. Courts have held that "[w]ithout either direct factual assertions or at least facts from which a reasonable inference may be drawn in support of its allegations, a claim that can meet this Circuit's culpable participation standard has not been stated." *Harrison v. Enventure Capital Group, Inc.*, 666 F.Supp. at 479. One court found that the standard had been met where the complaint's allegations were such that "one can imagine a scenario in which the 'controlling persons' encouraged and permitted the issuance" of statements they knew were false. *Hemming v. Alfin Fragrances, Inc.*, 690 F.Supp. at 245.

 Plaintiffs also seek to hold A.K. Patel, Robbins and Shah secondarily liable on the grounds that they aided and abetted the primary violation. To this end, plaintiffs are required to establish three elements: (1) the existence of a primary violation by someone other than the alleged aider and abettor; (2) knowledge of and specific intent to promote this violation;

and (3) "substantial assistance" in the achievement of the primary violation. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 62 (2d Cir.1985); *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983); *IIT, An International Investment Trust v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980).

### 1. R.K. Patel and Levine

According to the complaint, R.K. Patel and Levine are directors of Par and both serve on the Stock Option Committee and the Executive Committee. R.K. Patel is also the director of research and development and a Senior Vice President and Assistant Secretary of the company. Levine is Par's president. It is alleged that they and the other directors "delegated full authority" to A. Patel and Shah "to determine Par's course of conduct concerning the company's activities in regard to obtaining expedited approval from the FDA of Par products." Complaint at ¶ 88. Other allegations are also made against R.K. Patel and Levine as two of the "Director Defendants." These include that they had the power to direct Par's activities, *id.* at ¶ 19; acted to conceal the adverse non-public information about Par, *id.;* and, because of their positions and access, knew that the adverse information existed and had not been disclosed; and were aware of the bribery scheme, *id.* at ¶¶ 88, 124. Finally, as Director Defendants, they allegedly were able to directly or indirectly control the content of Par's statements, and signed and attested to the truth and accuracy of some of them, *id.* at ¶ 20.

The complaint, taken as a whole, sufficiently alleges control person liability against R.K. Patel and Levine. Their positions as officers and directors of the corporation create an inference that they were involved in establishing corporate policy and preparing and reviewing SEC filings, and other corporate documents. It is also fair to presume that the directors and officers collectively issued the misleading statements. *See Wool v. Tandem Computers, Inc.,* 818 F.2d at 1441. The additional facts, including (a) their signing of Par's Forms 10–K, (b) their delegation of authority to A. Patel and Shah, and (c) the power and influence of the Director Defendants to direct the activity of Par and to control the contents of the various statements, further strengthen the inference that R.K. Patel and Levine were culpable participants in the alleged fraud.

For the same reasons, the complaint also sufficiently asserts aiding and abetting liability against R.K. Patel and Levine. As directors who each knew that the bribery scheme existed, who deliberately schemed to inflate the price of the company's stock and earnings, and who, to protect their positions as directors and officers, issued misleading statements without disclosing the improper means by which such achievements had been obtained, R.K. Patel and Levine rendered "substantial assistance" to the accomplishment of the fraud. *See Goldman v. Belden,* 754 F.2d at 1070–72; *King v. E.F. Hutton & Co., Inc.,* [1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,176 at 95,790, 1987 WL 8733 (D.D.C.1987).

Accordingly, the motions of R.K. Patel and Levine to dismiss the § 20(a) claims and the aiding and abetting claims are denied.[13]

### 2. Robbins

Defendant Robbins is an outside director of Par. Plaintiffs emphasize that Robbins was the sole member of the Audit Committee for much of the Class Period and, as such, "had access to the books and records of the Company which reflected all

---

**13.** While it is unclear whether defendant A. Patel joins this argument, the Court holds that, for the reasons stated as to R.K. Patel and Levine, the complaint states claims against A. Patel for controlling person and aiding and abetting liability. Like R.K. Patel and Levine, A. Patel is alleged to have been a director and officer of the company, and is included in all of the allegations against the Director Defendants. Moreover, A. Patel is also alleged, along with Shah, to have made the illegal payments to F.D.A. officials pursuant to the bribery scheme. Accordingly, the conclusions reached as to R.K. Patel and Levine apply equally, if not greater, to A. Patel.

payments made by the Company." Complaint at ¶ 88. Like R.K. Patel and Levine, Robbins, as one of the Director Defendants, allegedly "delegated full authority" to A. Patel and Shah to seek expedited approval from the FDA of Par products, *id.;* was aware of the bribery scheme, *id.* at ¶ 124; acted to conceal it, *id.* at ¶ 19; and signed some of Par's allegedly misleading statements, *id.* at ¶ 20. Again, these allegations are sufficient to state a *prima facie* case of § 20(a) controlling person liability.

Aiding and abetting liability against Robbins has also been sufficiently pleaded, for the same reasons noted *supra* with respect to R.K. Patel.

▆▆▆ Robbins also asks the Court to dismiss the complaint on the grounds that it does not satisfy the particularity requirements of Rule 9(b). The complaint specifies the statements alleged to be false or misleading, the time and place in which such statements were made, and which of the defendants made the statements (either directly or indirectly), and explains why plaintiffs believe the statements were false or misleading. Robbins is specifically alleged to have signed Par's Form 10–K's for 1986 and 1987 and to have had access, as the sole member of the audit committee to Par's books and records, which plaintiffs allege included information as to the alleged payments. Thus, the allegations of the complaint are adequate to give Robbins notice of the charges against him, and they satisfy the requirements of Rule 9(b). *See Goldman v. Belden,* 754 F.2d at 1069–70; *In re Coleco Securities Litigation,* 591 F.Supp. 1488, 1489 (S.D.N.Y.1984); *Gross v. Diversified Mortgage Investors,* 431 F.Supp. 1080 (S.D.N.Y.1977).

For these reasons, Robbins' motion to dismiss Count I of the complaint is denied.

### 3. Shah and Quad

Defendant Shah is not an officer or director of Par, but instead is the president and chief executive officer of Quad. Shah, along with A. Patel, allegedly made the illegal payments to FDA officials. The complaint asserts liability against Shah and Quad on the ground that they aided and abetted the primary violation. Shah argues that the claim against him must be dismissed because there is no allegation that he intended to assist Par in making misstatements, or that he rendered substantial assistance to any acts of securities fraud by Par. Quad joins in his argument.

Shah does not dispute (for purposes of this motion) that he rendered substantial assistance to the bribery scheme. He argues, however, that the complaint does not sufficiently allege scienter to hold him as an aider and abettor. He also argues that the complaint makes no allegations that he assisted in the preparation or dissemination of Par's misleading statements, nor is it alleged that he had any authority to determine the contents or timing of Par's statements. Shah submits, therefore, that he is not alleged to have given substantial assistance to the primary violation and therefore cannot be held liable as an aider and abettor.

▆▆▆ Shah and Quad first argue that plaintiffs have not alleged the requisite scienter. The complaint, however, expressly alleges that Shah and Quad "knew that the adverse facts specified herein existed and that such adverse facts had not been disclosed to the investment community," ¶ 22; that "[e]ach of the defendants herein knew ... [the] misleading statements ... would adversely affect the integrity of the market for Par common stock and artificially inflate or maintain the price ...," and in doing so acted knowingly, ¶ 23. These allegations, which support an inference that Shah and Quad intended to aid the other defendants in their alleged plan to defraud investors, are sufficient to meet the heightened scienter requirement described in *IIT, An International Investment Trust,* 619 F.2d 909 (2d Cir.1980) and *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478, 484 (2d Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980), which held that, in the absence of a duty to disclose, the scienter requirement scales upward such that the defendant must act with "something closer to actual intent to aid in

a fraud," *Edwards & Hanly*, 602 F.2d at 485, or " 'scienter of the high "conscious intent" variety'." *IIT, An International Investment Trust*, 619 F.2d at 925 (quoting *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir.1975)).

■■■ Shah and Quad next argue that the complaint does not adequately allege substantial assistance on their part. Although some cases have held that the alleged aider and abettor must have substantially assisted the preparation or dissemination of the fraudulent statements, *see, e.g., In re Union Carbide Business Securities Litigation*, 666 F.Supp. 547, 564 (S.D.N.Y.1987); *Terrydale Liquidating Trust v. Gramlich*, 549 F.Supp. 529, 531 (S.D.N.Y.1982), it is well established that silence or inaction can be substantial assistance when it is "designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act." *Armstrong v. McAlpin*, 699 F.2d at 91 (citing *IIT, An International Investment Trust v. Cornfeld*, 619 F.2d at 925–27).

Even assuming that the bribery itself was not action enough to amount to substantial assistance to the securities fraud, the complaint sufficiently alleges that the intentional failure of Shah and Quad to disclose the bribery scheme was designed to aid that fraud. The failure of these defendants to disclose the existence of the bribery scheme, of course, assisted the securities fraud, since disclosure would have destroyed the securities scheme. It is also a fair inference from the complaint that Shah's and Quad's failure to disclose was designed intentionally to aid the securities fraud, since the securities fraud provided Shah and Quad with protection from disclosure of the bribery by the other defendants. Disclosure of the bribery scheme would likely have led to criminal penalties for Shah and Quad. In those respects, this case is similar to *Brennan v. Midwestern Life Insurance Co.*, 417 F.2d 147 (7th Cir. 1969), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970), in which aider-abettor liability was found where the de-

fendant did not disclose the wrongdoing, which was being committed by a dealer in defendant's stock, because the wrongdoing benefitted its plans to merge with another company.

Furthermore, Shah and Quad were more than mere bystanders to the securities fraud. Shah, on behalf of Quad and the other defendants, personally implemented the bribery scheme. While the bribery alone did not assist the preparation of misleading statements, nor was it the proximate cause of plaintiffs' harm,[14] the combination of these defendants' participation in the bribery, knowledge of the securities fraud, and intentional inaction for their own benefit, support a conclusion that Shah and Quad "associate[d] themselves with the venture or participate[d] in it as something they wish[ed] to bring about." *IIT, An International Investment Trust v. Cornfeld*, 619 F.2d at 927 (citing *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (L. Hand, J.)).

Accordingly, the motions to dismiss the claim of aiding and abetting liability against defendants Shah and Quad are denied.

## III. THE RICO CLAIMS

Counts II and III of the complaint charge that all of the defendants except Par violated RICO by conducting the affairs of an enterprise (Par) through a pattern of racketeering activity. The pattern of racketeering activity allegedly consisted of a scheme or schemes to commit the following alleged predicate acts: (1) bribing FDA officials in violation of 18 U.S.C. § 201, (2) mailing false and materially misleading financial statements in violation of the mail fraud statute, 18 U.S.C. § 1341, and (3) the wire fraud statute, 18 U.S.C. § 1343, and (4) violating § 10(b) of the Exchange Act and Rule 10b–5. Complaint at ¶ 134. Count II claims a substantive violation of RICO, 18 U.S.C. § 1962(c), while Count III claims a violation of the RICO conspiracy provision, 18 U.S.C. § 1962(d).[15]

---

**14.** *See infra.*

**15.** Defendants make an argument, to which plaintiffs do not respond, that the RICO statute

The elements of a RICO claim are (1) the existence of an "enterprise" engaged in or affecting interstate commerce; (2) a pattern of racketeering activity by the defendants; (3) a nexus between the pattern of racketeering activity and the enterprise; and (4) an injury to plaintiff in his business or property "by reason of" the violation of RICO. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

### A. Does the Complaint Allege Predicate Acts?

In § 1961(1), the RICO statute defines "racketeering activity" by listing numerous predicate acts. Thus, the initial question in evaluating this claim is whether it alleges that the defendant has committed any of the predicate acts. The bribery, mail fraud and wire fraud alleged by plaintiffs in this case are specifically included in § 1961(1) and are therefore sufficiently pleaded as predicate acts. With respect to the allegation that defendants violated § 10(b) and Rule 10b–5, however, plaintiffs have *not* alleged a "predicate act" under § 1961(1).

Section 1961(1)(D) lists "fraud in the sale of securities" as a predicate act. In *Moss v. Morgan Stanley*, 719 F.2d 5, 18 n. 4 (2d Cir.1983), the Second Circuit declined to address the "complex and far-reaching question" of the scope of this language, and the issue of whether it covers all securities fraud under § 10(b) apparently remains undecided.

By the plain language of § 1961(1)(D), securities fraud is only a predicate offense if the fraud occurs in the actual *sale* of a security.[16] Plaintiffs have given the Court no basis for holding that the language Congress used should not be read literally. Nor have plaintiffs directed the Court to any legislative history suggesting that Congress meant to make all violations of § 10(b) predicate acts under RICO. Thus, giving § 1961(1)(D) its plain meaning, RICO does not incorporate all violations of § 10(b) and Rule 10b–5, but rather is limited to those fraudulent acts that occur in an actual sale transaction.

It is reasonable to assume that Congress, had it wanted to make the RICO predicate acts coextensive with § 10(b), would have used the same or similar language in § 1961(1)(D) that it used in § 10(b). Had Congress intended RICO to be coextensive with § 10(b), it certainly knew how to do so.[17] However, "fraud in the sale of securities" is quite limited in comparison to the broader language Congress used in § 10(b), which prohibits fraud "in connection with the purchase or sale of any security." The "in connection with" language provides

---

is unconstitutionally vague. The Court declines to strike down the RICO statute in this context, in light of the fact that numerous other courts have held various aspects of the statute to be constitutional. *See, e.g., United States v. Clemente,* 640 F.2d 1069 (2d Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981); *United States v. Parness,* 503 F.2d 430 (2d Cir.), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1974); *United States v. Chovanec,* 467 F.Supp. 41 (S.D.N.Y.1979); *United States v. Castellano,* 416 F.Supp. 125 (E.D.N.Y.1975); *United States v. Amato,* 367 F.Supp. 547 (S.D.N.Y.1973). The Court further denies defendants' request that the issue be certified for interlocutory appeal.

**16.** *See International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 152 (4th Cir.1987) ("The statutory language describing the predicate offense ... is, however, narrow and suggests the pivotal role of the actual sales transaction.").

**17.** The Second Circuit's discussion in *Securities and Exchange Commission v. Texas Gulf Sul-*

*phur Co.,* 401 F.2d 833, 860 (2d Cir.), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968), is apt here:

[C]omparisons of Section 10(b) with the anti-fraud provisions of the Securities Act of 1933 [§ 12(2) reads "offers or sells a security by means of"; § 17(a) reads "in the offer or sale of any securities"] and with the 1936 anti-fraud amendment of Section 15 of the Securities Exchange Act of 1934 [which reads "effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security"] demonstrate that when Congress intended that there be a participation in a securities transaction as a prerequisite of a violation, it knew how to make that intention clear.

*See also* Bridges, *Private RICO Litigation Based Upon "Fraud in the Sale of Securities,"* 18 Ga.L. Rev. 43, 62 ("if [Congress meant securities fraud in general, it would have said simply 'securities fraud' or 'fraud involving securities'" in § 1961(1)).

standing only to plaintiffs who have either purchased or sold securities, but it does not limit liability to defendants who sold or bought from the plaintiffs. Thus, under the "in connection with" requirement, a defendant may be held liable even though he was not a party to a securities transaction.[18] This concept arose directly out of the "in connection with" language.[19] The language in § 1961(1)(D)—"fraud in the sale of securities"—is much less susceptible to such an interpretation, and to stretch the language so far in the absence of any evidence that Congress intended such a result would be an act of judicial legislation.

When one considers that Congress "enacted this legislation in 1970 against the developed backdrop of almost forty years of federal securities law," *International Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 152 (4th Cir.1987), the fact that Congress opted not to use the language "in connection with the purchase or sale of any security," or something similar, must be considered significant and meaningful. Additionally, Congress chose not to use the broad language it used in defining other predicate acts in § 1961(1), such as bankruptcy fraud, where it used the language "any offense involving fraud connected with a case under title 11." Congress could have incorporated the broad reach of § 10(b) quite simply by using similar language, but it did not do so.

The Court's conclusion is that the phrase "fraud in the sale of securities" as used by Congress in § 1961(1)(D) must be read to mean what it says, such that only fraud that occurs as part of the actual securities transaction is a predicate act under that provision. In this case, it is not alleged that defendants sold any securities to plaintiffs. Instead, plaintiffs claim that defendants' issuance of misleading statements caused them to buy their shares *on the open market* at artificially inflated prices. Therefore, defendants have not committed "fraud in the sale of securities" as is required by § 1961(1)(D), and plaintiffs have not stated a RICO claim based on defendants' alleged securities fraud.[20]

## B. Do the Plaintiffs have Standing?

With respect to the other alleged predicate acts, defendants argue that plaintiffs lack standing to bring the RICO claims. In *Sedima*, the Supreme Court held that a "plaintiff only has standing [under 1964(c)] if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Id.* 473 U.S. at 496, 105 S.Ct. at 3285. Thus, plaintiffs must allege facts indicating their injury was proximately caused by the RICO pattern of racketeering activity or the individual RICO predicate acts. *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir.1990). In *Hecht*, the Court of Appeals explained the RICO causation requirement as follows: "the RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a

---

**18.** *See Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d at 860.

**19.** In the seminal case of *Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d at 860, the Second Circuit stated:

> it seems clear ... that Congress when it used the phrase "in connection with the purchase or sale of any security" intended only that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell securities. There is no indication that Congress intended that the corporations or persons responsible for the issuance of a misleading statement would not violate the section

unless they engaged in related securities transactions....

**20.** *See also First Pacific Bancorp, Inc. v. Bro*, 847 F.2d 542, 546 (9th Cir.1988) (no RICO predicate act where there was no sale of securities); Note, *RICO and Securities Fraud: A Workable Limitation*, 83 Colum.L.Rev. 1513, 1542 (1983) ("Where the wrongful act alleged is a failure to properly disclose information, such violation ... does not constitute a predicate offense under RICO."); Bridges, *Private RICO Litigation Based Upon "Fraud in the Sale of Securities,"* 18 Ga.L.Rev. 43, 58–63 (1983) (RICO does not extend to fraud that is not part of the actual sale of securities). *But Cf. Lou v. Belzberg*, 728 F.Supp. 1010 (S.D.N.Y.1990) (section 13(d) violation is a RICO predicate act).

natural consequence." *Id.* at 24. Thus, factual causation is insufficient. *Id.* at 24.

■ In this case, plaintiffs' allege they were "damaged as a result of the pattern of racketeering activity ... and incurred substantial monetary damages, including paying an artificially inflated purchase price for their shares of Par common stock." The issue, then, is whether the alleged predicate acts that remain—bribery, mail fraud and wire fraud—proximately caused the plaintiffs to buy Par stock at an artificially inflated price.

In *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22 (1st Cir.1987), much like the present case, the plaintiff alleged that a bribery scheme and the nondisclosure thereof violated the securities laws and RICO. In his RICO claim, the plaintiff claimed that he had been injured because he purchased stock at an inflated price before disclosure of the bribery, and because the stock declined in value after disclosure. After dismissing the securities fraud claim, the court ruled that the bribery scheme did not proximately cause the inflation of the stock price, saying that "an inflated market price of Alpha's stock would not be 'by reason of' the bribery. If the price of [the company's] stock was higher than it should have been, this was 'by reason of' nondisclosure." 814 F.2d at 29. The same conclusion is warranted here. In this case, to the extent plaintiffs were injured, it was because they were induced to purchase Par stock at a price that did not reflect the fact that Par's success was at least partly the result of the bribery scheme. Had there been disclosure, the plaintiffs clearly would not have bought the stock at that price and therefore would have suffered no injury. Thus, plaintiffs' claim in this case that they were injured by reason of the bribery predicate acts is without merit.[21]

■ Finally, defendants argue that the portion of the RICO claim based on mail and wire fraud predicate acts fails to state a claim because plaintiffs have not alleged reliance on the claimed misleading statements. In ¶ 128 of the complaint, however, plaintiffs allege that they "relied, to their damage, on the reports and statements ... and/or the integrity of the market price of Par common stock." Thus, reliance on the misleading statements has been alleged, and plaintiffs must be allowed the opportunity to prove it.[22]

## C. The RICO Conspiracy Claim

■ The second RICO claim alleges that defendants Levine, A. Patel, R.K. Patel, Robbins, Shah and Quad conspired to violate RICO, and are therefore liable to plaintiffs under § 1962(d).[23]

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." Having limited the alleged predicate acts to mail and wire fraud, the Court reads the complaint as alleging that the defendants conspired to inflate artificially the price of Par's stock through a pattern of mail and wire fraud in violation of § 1962(c).

21. The complaint in this case does not allege that plaintiffs were injured by the eventual decline in the price of Par stock caused by the bribery scheme. However, even reading the complaint as implying such an allegation, plaintiffs have not stated a RICO claim. In *Roeder,* the court held that the subsequent decline in the stock price resulting from the bribery was an injury to the corporation, and not the plaintiff, and therefore did not cause plaintiff's injury under RICO. The court relied on *Rand v. Anaconda–Ericsson, Inc.,* 794 F.2d 843 (2d Cir.), *cert. denied,* 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986), in which the Second Circuit held that the decrease in value of a plaintiff's shares as a result of RICO predicate acts was an injury to the corporation, not the plaintiff, and therefore the plaintiff could not bring a RICO claim on that basis. As in those cases the eventual decline in the value of Par stock "merely reflects the decrease in the value of the firm as a result of the alleged illegal conduct." *Rand,* 749 F.2d at 849, and therefore plaintiffs suffered no particularized injury entitling them to recovery.

22. The mail and wire fraud predicate acts are alleged only against the Director Defendants, and not Shah and Quad. Therefore, no RICO claim has been alleged against Shah and Quad.

23. This claim fails against defendants Shah and Quad for the same reasons the substantive RICO claim fails against them. *See supra* note 16.

As with their substantive RICO claim, to have standing to assert their conspiracy claim against the defendants, plaintiffs must allege that they have been injured by the conspiracy. The Second Circuit recently held that, because an agreement cannot by itself cause injury, "injury from an overt act is necessary and sufficient to establish civil standing for a RICO conspiracy violation." *Hecht*, at 25. The court further held that those overt acts must also be § 1961 predicate acts in order to confer standing. *Id.*

Since Shah and Quad are not alleged to have committed any of the predicate acts of mail and wire fraud, plaintiffs do not have standing to assert a RICO conspiracy claim against them. With respect to the Director Defendants, however, who are alleged to have engaged in mail and wire fraud by mailing false and materially misleading financial statements and causing the same to be transmitted by wire communication, the complaint's allegations of overt predicate acts in furtherance of the alleged conspiracy are sufficient to give plaintiffs standing under RICO. Accordingly, defendants' motions to dismiss Count III of the complaint is granted as to Shah and Quad and denied as to the Director Defendants.

### IV. THE STATE LAW CLAIMS

Since federal claims have been stated against each of the defendants, principles of pendent jurisdiction support this Court's exercise of jurisdiction over Counts IV and Count V.

■ Count V, however, which alleges negligent misrepresentation by the Director Defendants and Par, fails to state a claim upon which relief may be granted. Under New York law, a claim for negligent misrepresentation must generally be based on formal contractual privity between plaintiff and defendant, *see Ultramares Corp. v. Touche*, 255 N.Y. 170, 179, 174 N.E. 441 (1931), but this requirement is occasionally relaxed where the defendant intentionally directed a misstatement at a "settled and particularized class," the identity of the members of which the defendant

was aware before the misstatement was made. *Brickman v. Tyco Toys, Inc.*, 722 F.Supp. 1054, 1062 (S.D.N.Y.1989), quoting *White v. Guarente*, 43 N.Y.2d 356, 363, 401 N.Y.S.2d 474, 479, 372 N.E.2d 315, 320 (1977). Here, plaintiffs were not such a particularized group when the misrepresentations were made, but simply members of the general investing public who might choose to invest in Par based on the company's statements. Moreover, the alleged misstatements were made in annual reports, quarterly reports, press releases, a magazine article and documents filed with the SEC, indicating that they were not directed by defendants at any specific group. Accordingly, Count V of the complaint fails to state a claim for negligent misrepresentation against the defendants. *See Brickman v. Tyco Toys, Inc., supra.*

### V. CONCLUSION

In summary, Counts I, II and III of the complaint are dismissed in certain respects, as described above, and Count V of the complaint is dismissed in its entirety. With respect to the remainder of the complaint, defendants' motions to dismiss are denied. Plaintiffs are ordered to file and serve, within 10 days of the entry of this opinion and order, an amended complaint to accord with this opinion.

SO ORDERED.